**CEDARAPIDS, INC., on Behalf of its EL–JAY DIVISION, Plaintiff,**

v.

**NORDBERG, INC., Defendant.**

No. C93–0096.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Aug. 10, 1995.

1234

Stephen J. Holtman and Donald R. Schoonover of Simmons, Perrine, Albright & Ellwood, L.L.P., Cedar Rapids, IA, for plaintiff Cedarapids.

Lawrence J. Crain and Roger D. Greer of Greer, Burns & Crain, Ltd., Chicago, IL, for defendant Nordberg.

## TABLE OF CONTENTS

I. BACKGROUND .................................................. 1236

II. STANDARDS FOR SUMMARY JUDGMENT ............................. 1238

III. FINDINGS OF FACT .......................................... 1240
 A. Undisputed Facts ....................................... 1240
 B. Disputed Facts ......................................... 1243

IV. LEGAL ANALYSIS ............................................. 1246
 A. Invalidity ............................................. 1246
 1. Enablement and definiteness ......................... 1246
 a. Enablement ...................................... 1247
 b. Definiteness .................................... 1251
 2. Prior art .......................................... 1255
 a. Anticipation .................................... 1255
 b. Obviousness ..................................... 1259
 i. Scope and content of prior art .............. 1260
 ii. Level of ordinary skill in the art .......... 1262
 iii. Objective evidence of nonobviousness ........ 1262
 iv. Differences between the prior art and claimed invention .... 1263
 B. Infringement ........................................... 1266
 1. Literal infringement ............................... 1267
 a. Claim construction .............................. 1267
 b. Determination of whether the claims "read" on the accused device .... 1271
 2. Infringement under the "doctrine of equivalents" ................... 1272

V. CONCLUSION ................................................. 1277

---

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

BENNETT, District Judge.

At its nub, this patent litigation is about a method to make a specific type of rock crusher crush more rock in less time. In this lawsuit for declaratory judgment concerning the validity and infringement of a patent, the parties have filed cross motions for summary judgment on essentially the same issues, albeit from different perspectives. The patent in suit is for a method to increase the performance of "a conical crusher," which is an apparatus that crushes rock for a variety of commercial purposes, including asphalt paving. Both parties argue the validity, or in-validity, of the patent in terms of "enablement" and "definiteness," pursuant to 35 U.S.C. § 112, and in terms of "anticipation" and "obviousness" under the prior art, pursuant to 35 U.S.C. §§ 102(a) and 103, respectively. Both also argue infringement, or non-infringement, under theories of literal infringement and "doctrine of equivalents" infringement. In addition, the plaintiff has moved to bifurcate trial of the liability and damages issues.

### I. BACKGROUND

This lawsuit for declaratory judgment was filed in the United States District Court for the District of Oregon on March 15, 1993. The Oregon court, however, ordered transfer

of the lawsuit to the Northern District of Iowa on April 2, 1993. In this lawsuit, plaintiff Cedarapids, Inc., seeks declaration that it is not infringing U.S. Patent No. 4,697,745 (hereinafter, the "'745 patent"), which is owned by defendant Nordberg, Inc., and further declaration that the '745 patent is invalid on several grounds. On May 17, 1993, Nordberg filed a counterclaim alleging that Cedarapids is infringing the '745 patent. The '745 patent is for a "high performance conical crusher," which is a device used to crush rock, mineral ores, and other hard materials into products more readily usable for commercial purposes or for further processing. Nordberg asserts that the '745 patent is for an optimal interrelationship of "speed" and "throw," two aspects of crusher performance, resulting in increased efficiency and output without increasing the size of the crusher chamber. Nordberg claims to have incorporated the '745 patent into its HP300 conical crusher. Cedarapids has developed an allegedly infringing product called a Rollercone II.

This case was reassigned to the undersigned on May 10, 1995. It is currently before the court on the following matters: (1) Cedarapids' February 14, 1994, motion for summary judgment (docket no. 23), which was resisted on March 18, 1994; (2) Cedarapids' March 1, 1995, motion to bifurcate trial of liability and damages (docket number 49), which was resisted on March 20, 1995; and (3) Nordberg's April 17, 1995, motion for summary judgment on counterclaim (docket number 55), which was resisted on May 15, 1995.

The court held oral arguments on the motions on July 31, 1995. Plaintiff Cedarapids was represented by counsel Stephen J. Holtman and Donald R. Schoonover of Simmons, Perrine, Albright & Ellwood, L.L.P., of Cedar Rapids, Iowa. Tim Kennedy, General Counsel for Cedarapids, Inc., was also present, but took no part in the proceedings and did not enter an appearance. Defendant Nordberg was represented by counsel Lawrence J. Crain and Roger D. Greer of Greer, Burns & Crain, Ltd., of Chicago, Illinois.

The court's disposition of the cross-motions for summary judgment, of course, has signifi-cant implications for the motion to bifurcate trial. If the entire matter is disposed of on summary judgment, the motion to bifurcate trial will obviously be mooted. Disposition of the summary judgment motions might, on the other hand, require a trial on damages only, or a trial on both liability and damages. The court therefore turns first to the cross-motions for summary judgment.

Cedarapids's motion for summary judgment was filed February 14, 1994. In its motion, Cedarapids asserts that Nordberg has conceded the only facts necessary to grant Cedarapids's motion, and consequently to deny Nordberg's cross-motion for summary judgment. Cedarapids points to Nordberg's concession that "it was well known in the crusher industry that variations in crusher speed, throw, power draw, crusher setting, feed size, feed type, ambient operational temperature, among other factors, could influence crusher productivity in tons per hour...." Thus, Cedarapids argues, Nordberg has conceded the obviousness of the alleged "invention" embodied in the '745 patent.

More specifically, Cedarapids asserts that the supposedly patentable aspect of the '745 patent was anticipated, pursuant to 35 U.S.C. § 102(a), by any one of four prior art references. Cedarapids contends that even if no one prior art reference anticipated the '745 patent, the prior art as a whole demonstrates the "obviousness" of the '745 patent, and the patent is therefore invalid pursuant to 35 U.S.C. § 103. Cedarapids also contends that the patent is invalid pursuant to 35 U.S.C. § 112, because it is insufficiently specific for persons familiar with the art to make and use the claimed invention from the patent without undue experimentation, an argument based on "enablement," as well as because it is too "indefinite" as to what constitutes the alleged invention. Cedarapids's enablement argument is essentially that the claimed invention does not specify the increases in speed and throw necessary to obtain the optimal performance. Its definiteness argument is that it is unclear whether the '745 patent pertains to a retrofit, redesign, or replacement of an existing crusher, and thus it is unclear what conduct would be infring-

ing. Cedarapids contends that the plain meaning of the first claim of the '745 patent is that it pertains only to a retrofit situation. Hence, Cedarapids argues that, if the patent is valid, Cedarapids is not infringing the patent, because its allegedly accused device is not a retrofit of an existing crusher using the method defined in the '745 patent, but a newly-designed device.

Nordberg's resistance to Cedarapids's motion for summary judgment and its own cross-motion for summary judgment assert the validity of the '745 patent and Cedarapids's infringement of that patent. Nordberg asserts that there are genuine issues of material fact as to infringement and validity in its resistance to Cedarapids's motion for summary judgment. However, in its own motion for summary judgment, Nordberg asserts that as a matter of law its invention was not "obvious." Nordberg attacks Cedarapids's assertion that the so-called "Sawant Paper," by one of the co-inventors of Nordberg's crusher, concedes the obviousness of the invention. Rather, Nordberg argues that this paper identifies the variables for improved performance of crushers, but only the invention itself attained the optimal combination of variables. Nordberg asserts that Cedarapids's own witnesses asserted that the invention was not obvious, because they had to conduct extensive tests to verify the accuracy of the patent's statement of the effects of specified changes to "speed" and "throw." Nordberg also asserts that its '745 patent has not been anticipated by any prior art. As to infringement, Nordberg argues that Cedarapids's Rollercone II is sufficiently like its own invention in various, specified aspects to constitute an infringing product under the "doctrine of equivalents."

## II. STANDARDS FOR SUMMARY JUDGMENT

Because the parties have filed cross-motions for summary judgment, the court turns first to the standards applicable to disposition of such motions. "Summary judgment is appropriate in a patent case, as in other cases...." *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir.1994); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570,

1575 (Fed.Cir.1994) ("The grant of summary judgment [in a patent case] is appropriate where the standards set forth in Rule 56(c) are satisfied."); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993); *Continental Can Co. U.S.A., Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed.Cir.1991) ("Summary judgment is as available in patent cases as in other areas of litigation."); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed.Cir.1990) ("As in other cases, the grant of summary judgment under Fed.R.Civ.P. 56, is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.") (footnote omitted); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672 (Fed.Cir.1990); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576 (Fed.Cir.1989); *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir.1984); *Chore–Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir. 1983).

The Supreme Court has established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1560 (Fed.Cir.1995) ("The purpose of summary judgment is to avoid an unnecessary trial, by enabling an expeditious procedure whereby, for issues on which there is no material factual dispute, the court can decide the controversy by applying the law to the undisputed facts," citing *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512); *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264,

1265 (Fed.Cir.1991). Rule 56 "is a vehicle for the convenience of the parties and courts, for use when the circumstances warrant; but is not a substitute for trial when decision of the controversy requires resolution of disputed factual issues." *Glaverbel*, 45 F.3d at 1560 (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555).

The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

 (a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

 (b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

 (c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274 (Fed.Cir. 1995); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1536 (Fed.Cir.1995). Thus, in a patent case, in order for the court to grant summary judgment, "there must ... be no genuine issue of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered." *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995) (quoting *A.C. Aukerman Co.*

*v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed.Cir.1992)); *Nike, Inc.*, 43 F.3d at 646 ("Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.").

A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, and give the non-movant the benefit of all reasonable inferences that can be drawn from the facts. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Gasser Chair*, 60 F.3d at 773 (the district court must "view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor, ... and ... resolve all doubt over factual issues in favor of the party opposing summary judgment," quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir. 1985) (in banc)); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d at 1274; *Comair Rotron, Inc.*, 49 F.3d at 1536 ("The evidence provided by the nonmovant is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor."); *Keystone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed.Cir.1993).

The party seeking summary judgment "'always bears the initial responsibility of informing the district court of the basis for its motion.'" *Glaverbel*, 45 F.3d at 1560 (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553); *Conroy*, 14 F.3d at 1575; *Copelands' Enters., Inc. v. CNV, Inc.*, 945 F.2d 1563, 1565 (Fed.Cir.1991). The moving party must "'identify[ ] those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.'" *Glaverbel*, 45 F.3d at 1560 (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, which in turn cites *Fed.R.Civ.P.* 56(c)); *Conroy*, 14 F.3d at 1575 ("The moving party, however, need not produce evidence showing

the absence of a genuine issue of material fact but rather discharge[s] its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case.").

In response, " 'the nonmoving party [must] go beyond the pleadings and by [its] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." ' " *Glaverbel*, 45 F.3d at 1560 (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553). A material fact is one that may affect the decision, so that the finding of fact is relevant to the proceedings. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1196 (Fed.Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *Keystone Retaining Wall*, 997 F.2d at 1449 ("A material fact is one that may affect the decision, whereby the finding of that fact is relevant and necessary to the proceedings," citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). An issue of material fact is genuine if it has a real basis in the record. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1572 (Fed.Cir.1995) ("When material facts are in dispute summary adjudication may nonetheless be appropriate if, with all factual inferences drawn in favor of the non-movant, the movant would nonetheless be entitled to judgment as a matter of law."); *Tone Bros.*, 28 F.3d at 1196 ("The court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law."); *Continental Can*, 948 F.2d at 1265. The correct law must, of course, be applied, whether to undisputed facts or to disputed facts viewed favorably to the non-movant. *Stark*, 29 F.3d at 1573.

When the movant's burden of establishing the lack of a genuine issue of material fact has been met "in facial terms," the nonmovant must point to "some evidence in the record sufficient to suggest that [the non-movant's] view of the issue might be adopted by a reasonable factfinder." *Id.* at 1560–61. Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.' " *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). "[S]ummary judgment may be granted when no 'reasonable jury could return a verdict for the nonmoving party.' " *Nike, Inc.*, 43 F.3d at 646 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510); *see also Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d at 1274 (also citing *Anderson); Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196 (Fed. Cir.1994); *Tone Bros.*, 28 F.3d at 1196 ("The court must assess the adequacy of the non-movant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof."); *Keystone Retaining Wall*, 997 F.2d at 1449 (sufficient evidence must be presented that a reasonable fact finder could decide the question in the nonmovant's favor). With these standards in mind, the court turns to consideration of the parties' cross-motions for summary judgment.

### III. FINDINGS OF FACT

#### A. Undisputed Facts

Defendant Nordberg is the owner of U.S. Patent No. 4,697,745, called the '745 patent in these proceedings, which is entitled "Method And Apparatus For High Performance Coni-

cal Crushing," issued October 6, 1987.[1] Although the title of the patent indicates that it is for both a method and an apparatus, the apparatus claims were cancelled from the application for the '745 patent, although they were later issued as a separate patent not at issue here. As granted, the '745 patent contains only "method" claims.

"Conical crushers," to which the '745 patent pertains, crush a variety of materials for a variety of purposes. For example, conical crushers are used to crush rock, brick, and concrete for various commercial purposes, including asphalt paving. They are also used to crush iron ore for iron production, sand for glass, and even rock for recovery of gemstones. In simple terms, such crushers consist of an inverted bowl over a conical crusher head that gyrates, rather than rotates, thus crushing rock between the gyrating head and the lining of the bowl. Rock or other material is fed into the top of the crusher. It is then crushed by the gyrating head, and crushed material of a desired diameter is removed from the bottom of the machine. Crushers are mounted either on "permanent" foundations or on "portable" foundations, such as truck beds. Operation of a crusher usually involves other equipment, including conveyors and screens, and this equipment and the foundation or truck bed on which the crusher is mounted must be made to accommodate the size of the crusher. Because increased production in the industry was generally obtained by buying a larger diameter crusher, with consequent reconfiguration of other equipment and related expenses, a method of increasing production with a crusher of similar proportions obviating those reconfigurations and related expenses, was of recognized benefit to the crusher industry.

Conical crushers have remained remarkably consistent in design since the 1920s. There are, however, two kinds of conical crushers. The first kind, made today primarily by the Allis–Chalmers company, has a relatively tall cone and short throw. The second, based on a patent issued to Edgar B. Symons in 1925,[2] and therefore sometimes called a Symons crusher, has a relatively "flat" head, runs at a higher speed, and has a longer throw when compared to the Allis–Chalmers design. Nordberg's predecessor company became the licensee of the Symons patent in the 1920s.

It is recognized in the crusher industry that crusher performance, in terms of tons per hour of crushed material produced, is affected by variations in the speed, throw, power draw, crusher setting, feed size, feed type, including its hardness and moisture content, ambient operational temperature, and other variables. The variables at issue in this litigation are the "speed" and "throw" of the crusher. "Speed" means the speed at which the head gyrates. "Throw" compares the smallest and largest distances between the head and the liner of the crusher as the head gyrates. Crusher "setting" is the height of the head relative to the bowl, thus determining the maximum size of the feed material.

The '745 patent was a product of Nordberg's test program, which commenced in 1973 and was discontinued in 1985. Dissatisfied with conducting crusher performance evaluations at customers' facilities, Nordberg began a study program at its Mineral Research and Test Center located in Milwaukee, Wisconsin, where the variables of crusher performance could be systematically evaluated in controlled conditions. Nordberg's testing program revealed that increased productivity could be obtained from a crusher without changing its size, but instead by changing its speed and throw in combination. The application for the '745 patent followed in 1986.

Nordberg originally applied for the '745 patent on February 24, 1986. Claims 13, 19, 21, and 25 of the patent application are the predecessors of Claims 1, 9, 11, and 15 of the '745 patent as issued. These claims are so-called "independent" claims, and all other claims in the patent are dependent from one

1. The inventors are identified in the '745 patent as Ulhas S. Sawant, Vijia K. Karra, and Dean M. Kaja.

2. The Symons patent is U.S. Patent No. 1,537,-564, issued to Edgar B. Symons on May 12, 1925.

of these four independent claims. Only infringement, and hence the validity, of Claim 1, however, is at issue in these proceedings. The prosecution history of the '745 patent reveals that the examiner twice rejected all remaining claims on grounds of indefiniteness for failing to particularly point out and distinctly claim the subject matter which the applicants regarded as their invention, once on November 17, 1986, and again on April 24, 1987. However, the patent was ultimately issued on October 6, 1987.

The pertinent provision of the '745 patent for this litigation is Claim 1, which states as follows:

What is claimed is:

1. A method for increasing the productivity of a conical crusher for comminuting a volume of material over unit time, said crusher having a fixed outer configuration, a fixed bowl liner having a maximum diameter, a specific volumetric capacity, a conical head with a specified diameter and gyrating within said bowl liner at a specified throw, said head also having a specified gyrational speed and power draw, and said crusher having a specified setting or gap between said bowl liner and said head, with the crushing action taking place when the gyrating head moves toward the bowl liner, said method comprising:

increasing said throw of said head over the specified throw; and

increasing said gyrational speed over the specified speed.

Claim 1 has seven dependent claims, which further explain the claimed invention:

2. The method defined in claim 1 comprising replacing said head with a head having a diameter on the order of 10% greater than said specified head diameter.

3. The method defined in claim 1 comprising increasing said throw of said head on the order of 40% over said specified throw.

4. The method defined in claim 1 comprising replacing said bowl liner with a bowl liner having a volumetric capacity on

the order of 20% greater than said specified volumetric capacity.

5. The method defined in claim 1 comprising increasing said power draw on the order of 100% over said specified power draw.

6. The method defined in claim 5 wherein said increased power draw is on the order of 1,000 HP.

7. The method claimed in claim 1 comprising replacing said head with a head having a larger maximum diameter and replacing said bowl liner with a liner having a larger corresponding diameter without changing the size of said outer configuration of said crusher.

8. The method defined in claim 1 further comprising replacing said bowl liner with a bowl liner having a volumetric capacity greater than said specified capacity.

In prosecuting its patent application, Nordberg disclosed four prior art references, including two patents to Davis,[3] one to Vroom,[4] and an undated publication by Allis-Chalmers entitled "Hydrocone Crushers 22 to 84 Inch." Nordberg asserted that none of these prior art references disclosed the invention identified in its application.

Nordberg asserts that it used the method stated in the '745 patent to produce a new conical crusher, its model HP300, which enjoyed approximately a 30% increase in productivity over Nordberg's prior crusher of comparable size, which had been known as the Omnicone. The HP300 was introduced in 1990 and enjoyed considerable market success. Four times as many HP300s were sold during its first year of production as had been sold of its predecessor, the Omnicone, during its first year.

Cedarapids became aware of the '745 patent in 1989. Cedarapids had been manufacturing a conical crusher, known as the Rollercone Classic, in 36, 45, 54, 60, and 66 inch sizes since the late 1950s. However, in 1989, an applications engineer for the El–Jay division of Cedarapids named Robert Gemmel

3. U.S. Patent 3,797,759, issued to Davis *et al.*, on March 19, 1974, and U.S. Patent 4,012,000, issued to Davis *et al.*, on March 15, 1977.

4. U.S. Patent 4,147,309, issued to Vroom on April 3, 1979.

reviewed the '745 patent, and recognized that it posed a possible threat to the Rollercone Classic. In a memorandum dated November 7, 1989, Gemmed stated, "It appears that Nordberg is putting us on the run." He then provided his analysis of the '745 patent and the likely resulting Nordberg conical crusher, and proposed production of a Cedarapids crusher based on similar principles. In early 1990, Cedarapids became aware of the Nordberg HP300 at a trade fair, and Cedarapids engineers associated the HP300 with the '745 patent. Cedarapids prepared to respond to the competition provided by the HP300 by developing in March of 1990 a marketing plan for its own "supercone" crusher, called the Rollercone II, which was intended to "feature[ ] a significant increase in production that is related to length of stroke and added horsepower," and was intended, in part to "[c]ounter Nordberg's competitive threat—HP300." Rollercone II Marketing Plan, March 1990, Executive Summary, Defendant's Exhibit 14. Cedarapids then undertook its own test of performance variables for conical crushers between June and November 1990 at a customer's facility in Oregon known as Wildish. These tests focused on the effect of changes in speed and stroke length, or throw. Testing continued into 1992. Cedarapids engineers concluded that increased production could be obtained without changing the size of the crusher by increasing the throw, steepening the chamber angle, increasing the speed, and providing sufficient power.

Cedarapids concluded that it would not introduce modifications to existing machines to allow them to operate with a longer throw, because company officials believed that such modified machines would be prone to structural failures and because they believed such a course would be an inappropriate marketing strategy. Cedarapids therefore incorporated the changes suggested by testing into a new crusher model, called the Rollercone II, which had a faster speed and increased throw relative to Rollercone Classic machines of identical sizes. Rollercone II machines demonstrated an increase in productivity of approximately 30% over the comparably sized Rollercone Classic machines. Cedarapids introduced the Rollercone II line of crushers in 1992 and 1993. Because Rollercone II machines had nearly identical outer proportions to Rollercone Classic machines of comparable sizes, they could replace Rollercone Classic machines on existing foundations without adjustments or reconfiguration of other hardware.

By certified letter dated March 2, 1993, Nordberg notified Cedarapids that a 54-inch cone crusher manufactured by Cedarapids's El–Jay division was allegedly infringing Nordberg's '745 patent. Cedarapids then filed this lawsuit in the United States District Court for the District of Oregon on March 15, 1993, seeking declaratory judgment that Cedarapids is not infringing the '745 patent and that the patent in question is invalid. Cross motions for summary judgment followed.

### B. Disputed Facts

Cedarapids acknowledges that there are disputes of fact between the parties, and asserted at oral arguments that it could produce evidence to generate such disputes, but Cedarapids contends that there are no genuine issues of *material* facts precluding summary judgment in its favor that the '745 patent is invalid and not infringed. Nordberg asserts that there are genuine issues of material fact precluding summary judgment in Cedarapids's favor, but none precluding summary judgment in Nordberg's favor. The court will therefore survey the disputes of fact apparent from the record and asserted by the parties, leaving for discussion in the appropriate place the degree to which these disputes are material to the disposition of the motions for summary judgment.

Cedarapids contends that Nordberg did not disclose a number of prior art references that would have demonstrated the unpatentability of the '745 patent. The first of these is the Symons patent of 1925, which stated that the invention consisted of a conical crusher that obtained increased productivity by increasing speed and throw.[5] Cedarapids next

---

5. The Symons patent is U.S. Patent No. 1,537,-564 (hereinafter "the '564 patent"). This patent states that it is "a certain new and useful Improvement in Gyratory Cone Crushers." Claim

points to a brochure dating from the 1920s promoting Nordberg's "Symons" crushers, which states that the "new crushing process" is "similar to that of the ordinary gyratory [crusher], with the exception that it moves at least five times as great a distance and gyrates faster." Defendant's Exhibit 32, p. 8. Cedarapids contends that this reference demonstrates that the modifications for which Nordberg obtained a patent in 1987 were known in the 1920s. Nordberg contends that the comparison identified in both the Symons patent and the Nordberg brochure is not to an existing Symons crusher, but to a "traditional" gyratory crusher now exemplified by the Allis–Chalmers model and used almost exclusively for primary crushing. Nordberg contends that these references do no more than suggest that speed and throw are relevant to increased productivity, but that these prior references do not answer the questions of the interrelationship of these variables, which Nordberg asserts are addressed in the '745 patent.

Cedarapids next nominates as prior art anticipating or rendering obvious the '745 patent another brochure, this time from the 1970s, also by Nordberg, which states that

[t]he outstanding feature of the Symons Cone is its high productivity—delivering large tonnage of crushed product to desired specifications. Principally responsible for this large relative output is the Symons process of crushing. A combination of high speed gyration and wide travel of the crushing head results in a relatively free flow of materials through the crusher, a series of rapid hammer-like impacts on the material as it passes through, and rapid discharge of the crushed product.

Plaintiff's Exhibit 8, p. 8. Nordberg insists that this and the prior reference are cumulative of the Symons patent itself, and that all compare Symons cone crushers to the other form of the traditional cone crusher, rather than suggesting further development of the Symons cone, as taught by the '745 patent.

Finally, Cedarapids points to the "Sawant Paper," by one of the co-inventors of the '745 patent. Plaintiff's Brief In Resistance To Defendant's Motion For Summary Judgment, Exhibit B (hereinafter "Exhibit B"). In this paper, written in 1984, Sawant states,

The effects of varying the head throw and head speed on the productivity of the crusher are significant with setting held constant.... [From test results,] [i]t is obvious that a crusher with a larger throw and speed capabilities is more efficient and therefore cost effective.

Exhibit B, p. 3–4. Cedarapids contends that more than a year before the patent application was filed, the variables identified in the '745 patent had been discussed as producing the desired results when interrelated as suggested by the patent. Nordberg contends that the Sawant Paper only identifies speed and throw among a number of other variables, any of which can affect crusher performance, but does not establish the interrelationships between speed and throw articulated in the '745 patent.

Cedarapids points out that none of these prior art references was presented to the Examiner, but that a brochure produced by the Allis–Chalmers company was. Nordberg's citation of this brochure as prior art states that it

discloses the concept of adjusting the capacity of conical crushers by increasing throw, increasing Hp and increasing eccentric speed. It should be noted that the Allis–Chalmers crusher is designed to operate at a maximum of 500 Hp.

Plaintiff's Exhibit 2A, Information Disclosure Statement, pp. 1–2. This brochure, dating from about 1970, states that for maximum product output, the Allis–Chalmers Hydrocone crushers use large eccentric throw:

Overall crusher performance characteristics, including speed and horsepower, influence throw selection. Greater horsepower capability of HYDROCONE crushers means that larger throws can be applied than otherwise—and increasing throw means a definite increase in tons per hour of product passing a screen size. Larger

2 of the '546 patent states, in pertinent part, that it has "means for withdrawing the cone from the concave after each crushing impact, at such

speed, and through an excursion of such length, as to leave the material unsupported, after the crushing impact...."

throws—and higher capacities—are characteristic of HYDROCONE crushers. The result? A lot more saleable product because crusher capability can be used to its fullest extent.

Plaintiff's Exhibit 2A, Allis–Chalmers brochure, p. 9. Cedarapids argues that this disclosure also identifies the known relationship between speed and throw. Nordberg contends that all of the omitted references are cumulative of the teaching of the Allis–Chalmers brochure, which does not demonstrate the interrelationship of speed and throw taught by the '745 patent.

For its part, Nordberg has nominated a prior art reference as "teaching away" from the invention embodied in the '745 patent. In a particle breakage study produced by personnel employed by Allis–Chalmers, dated 1981, the authors discounted the impact of throw on increased crusher capacity:

> (5) It is a claim of some designs of cone crushers that the eccentric throw has some mystical influence on the capacity and size distribution produced by a particular machine. The pendulum tests supported by field observations prove conclusively that reduction and size distribution of products are simply related to the energy applied to the material. For a fixed application of power, increasing eccentric throw will reduce the force available to crush. This lowers the available power rate and, hence, the reduction ratio. The size distribution appears to be independent of the number of impacts causing this energy application.

Defendant's Exhibit 29, p. 19.

Nordberg asserts that there are genuine issues of material fact as to the extent to which Cedarapids's own engineers associated the HP300 with the '745 patent or recognized it as an embodiment of the patent. Nordberg also asserts that there are genuine issues of material fact as to the reasons Cedarapids conducted its own tests of the crusher performance variables identified in the '745 patent. Nordberg insists that the reason was that Cedarapids employees did not believe the teaching of the '745 patent, and therefore the patent's teachings were not anticipated or obvious. Cedarapids contends that its reasons for testing were irrelevant, but, in any event, were because the '745 patent left so much unexplained that Cedarapids could not tell the scope of the claimed invention nor make and use a device based on the patent. The parties dispute the extent and expense of the testing Cedarapids undertook in response to the '745 patent. Cedarapids asserts that it expended over two years and approximately $2 million in developing the design of the Rollercone II, and therefore the '745 patent could not be properly enabling. Nordberg counters that Cedarapids spent no more than about $12,000 in running its tests to confirm the teachings of the '745 patent. Nordberg also asserts that Cedarapids employees had no difficulty understanding the patent, although they now state to the contrary. Further, Nordberg alleges that, contrary to Cedarapids's contentions, conical crushers typically have a specified speed and throw, and that the Rollercone II can be recognized as a "retrofit" of a Rollercone Classic with increases from the specified speed and throw of the older model. Nordberg specifically alleges that Cedarapids used the '745 patent in the development of the Rollercone II, although Cedarapids asserts that the Rollercone II was the result of its own independent research and development.

Many of the other disputes of "fact" asserted by the parties are more properly disputes over the legal inferences to be drawn from the facts, and the court will not catalogue those differences of opinion here. The court will determine below the extent to which the disputes of fact identified by the parties and other factual disputes apparent from the record are *material* to the disposition of this matter. *See Fed.R.Civ.P.* 56(c); *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita Elec. Indus. Co.,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56; *Tone Bros.,* 28 F.3d at 1196; *Keystone Retaining Wall,* 997 F.2d at 1449. The court therefore turns consideration of the parties' arguments concerning validity and infringement of the '745 patent.

## IV. LEGAL ANALYSIS

### (Including Some Ultimate Findings Of Fact)

Because both parties argue essentially the same issues in their cross-motions for summary judgment and respective resistances, the court will not make any distinction here between the cross-motions for summary judgment until and unless it determines that one party or the other has failed in its burden to generate a genuine issue of material fact precluding summary judgment. The court turns first to issues of validity or invalidity, then to issues of infringement.

### A. Invalidity

The court's analysis begins with challenges to and assertions of the validity of the '745 patent, because if the patent is invalid, infringement becomes a moot issue. *Miles Laboratories, Inc. v. Shandon, Inc.,* 997 F.2d 870, 879 (Fed.Cir.1993) (because the court of appeals affirmed the district court's determination of invalidity, it did not reach the district court's infringement determination), *cert. denied,* —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994). However, the Supreme Court has directed that courts generally rule on validity issues even if the court determines that the patents were not infringed. *Cardinal Chem. Co. v. Morton Int'l, Inc.,* —— U.S. ——, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993); *see also Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557, 1562 (Fed.Cir. 1993) (noting this requirement), *cert. denied,* —— U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). Also, because either the validity or infringement determination may be separately dispositive of this case, the court will undertake to determine both the validity and infringement questions here. The invalidity or validity issue has two principal prongs here: (1) whether the '745 patent was too indefinite or lacked the necessary "enablement" to be valid under 35 U.S.C. § 112; and (2) whether the '745 patent was anticipated or obvious under prior art pursuant to 35 U.S.C. §§ 102 and 103.

---

6. Courts have drawn a number of other requirements from 35 U.S.C. § 112 which are not at issue here.

---

Under 35 U.S.C. § 282, a patent is presumed valid, and the party challenging validity has the burden of proving facts by clear and convincing evidence showing that the patent is invalid. *North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed.Cir.1993) (citing *Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed. Cir.1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *Morton Int'l, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1469 (Fed.Cir.1993); *see also Mendenhall,* 5 F.3d at 1564 (upholding jury instruction on presumption of validity of a patent stated in terms of "deference to be given the Patent Office's determination," which required the jury to compare the evidence before the Patent Office with that before the jury before deciding what weight to give to Patent Office's determination); *Intel Corp. v. United States Trade Comm'n,* 946 F.2d 821, 829 (Fed.Cir.1991) (validity of a patent is presumed under § 282, and invalidity must be proved by clear and convincing evidence); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986) (hereinafter *"Hybritech I "*), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). It is "axiomatic" that the claims define the invention which an applicant believes is patentable. *In re Van Geuns,* 988 F.2d 1181, 1184 (Fed.Cir.1993) (citing cases to so hold). In the patentability context, claims are to be given their "broadest reasonable interpretation." *Id.* Furthermore, limitations are not to be read into claims from the specification. *Id.* The court turns to whether Cedarapids has demonstrated the invalidity of the '745 patent sufficiently to be entitled to summary judgment.

### 1. Enablement and definiteness

Title 35 U.S.C. § 112 contains two requirements at issue here for the validity of a patent.[6] The first unnumbered paragraph establishes the so-called "enablement" requirement. It states as follows:

> The specification shall contain a written description of the invention, and of the

manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out [the inventor's] invention.

35 U.S.C. § 112; *Morton Int'l v. Cardinal Chemical Co.*, 5 F.3d 1464, 1469 (Fed.Cir. 1993). The second unnumbered paragraph of 35 U.S.C. § 112 contains the so-called "definiteness" requirement:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the applicant's] invention.

*Id.; see also North Am. Vaccine*, 7 F.3d at 1578 (definiteness requirement is found in second paragraph of § 112); *Morton Int'l*, 5 F.3d at 1469–70 (considering these two requirements separately); *Miles Lab., Inc. v. Shandon, Inc.*, 997 F.2d 870, 874 (Fed.Cir. 1993) (definiteness requirement is in § 112, ¶ 2); *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1181 (Fed.Cir.1991) ("definiteness" requirement is found in § 112, ¶ 2). It appears that the distinction between the two requirements is that between "utilization" of the invention, which relates to enablement,[7] and "scope" of the invention, which goes to its definiteness. *See, e.g., Morton Int'l, Inc.*, 5 F.3d at 1469–70; *Hybritech I*, 802 F.2d at 1384–85 (distinguishing between enablement and definiteness on the basis that the first requires that a patent enable one skilled in the art to make and use the invention, and the second requires that the patent apprise those skilled in the art as to what is claimed as the invention).

Although enablement and definiteness are separate and distinct requirements, *Hybritech, Inc. v. Abbott Lab.*, 849 F.2d 1446, 1453 (Fed.Cir.1988) (hereinafter "*Hybritech II* "), courts have long recognized the necessity of both requirements being met:

The law is clear that " '[i]f the claims, read in the light of the specification[s], reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more.' " *Shatterproof Glass Corp. v. Libbey–Owens Ford, Co.*, 758 F.2d 613, 624, 225 USPQ 634, 641 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985) (quoting *Georgia–Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136, 118 USPQ 122, 132 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958)).

*North Am. Vaccine*, 7 F.3d at 1579–80; *Miles Lab.*, 997 F.2d at 875 (stating that "[i]f the claims read in the light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more," but still considering both whether the "patent disclosed adequate information to enable a skilled artisan to make and use the claimed invention," pursuant to § 112, ¶ 1, and whether "the claims read in light of the specification reasonably apprise[d] those skilled in the art of the claimed invention."). Indeed, in *Hybritech II*, the court found that the same evidence supported the court's conclusion that both requirements had been met. *Hybritech II*, 849 F.2d at 1453. In *Hybritech II*, the patent in suit was for diagnostic kits for antibodies indicating certain physical conditions, such as pregnancy, cancer, growth hormone deficiency, or hepatitis. *Id.* at 1448. In the context of litigation of a request for a preliminary injunction, the court held that the district court's findings that "most everybody used the [specified] method to determine affinity constants" sufficed to establish both enablement and definiteness under the first and second paragraphs of § 112. *Id.* at 1453.

### a. Enablement

█ In *Morton Int'l, Inc.*, the court considered the question of "enablement" first,

---

7. "Utilization," which relates to enablement, and has to do with whether the patent enables a person skilled in the art to utilize the patented invention to produce the product intended, is not to be confused with "utility," a requirement of 35 U.S.C. § 101, which is founded on Article 1, § 8,

cl. 8, of the United States Constitution, which authorizes the granting of patents "to promote progress of ... *useful* arts." *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1180 (Fed.Cir.1991) (§ 101's requirement is based in this provision of the Constitution; emphasis added).

finding that the party asserting lack of enablement must prove by clear and convincing evidence *facts* establishing a lack of enablement. *Morton Int'l, Inc.*, 5 F.3d at 1469. However, lack of enablement is reviewed as a question of *law. Id.; In re Wright*, 999 F.2d 1557, 1561 (Fed.Cir.1993) ("As a statutory requirement, enablement is a question of law that we review de novo; however, we review for clear error any underlying facts found by the Board in rendering its enablement determination."); *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed.Cir.1993); *In re Vaeck*, 947 F.2d 488, 495 (Fed.Cir.1991); *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1212 (Fed.Cir.), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991); *In re Wands,* 858 F.2d 731, 735 (Fed.Cir.1988). A genuine issue of material fact may nonetheless preclude summary judgment of lack of enablement as a matter of law. *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1568 (Fed.Cir.1990) (genuine issues of material fact precluded summary judgment on question of enablement), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). Nothing more than objective enablement is required, and therefore it is irrelevant whether the teaching of the patent is provided through broad terminology or illustrative examples. *In re Wright*, 999 F.2d at 1561.

■ The focus of the enablement requirement in *Morton Int'l, Inc.*, was whether the invention was described with sufficient exactness to "enable any person skilled in the art ... to make and use the same." *Morton Int'l, Inc.*, 5 F.3d at 1469; *Fiers*, 984 F.2d at 1171. However, enablement is determined by reference to the state of the art at the time of the patent application, rather than at some later time. *Wright*, 999 F.2d at 1562. Therefore, the fact that experimentation would not be necessary at the time of the challenge to the patent, because of work in the art occurring after the patent application, does not mean that the patent was properly enabled at the time it was issued. *Id.* at 1561–62. In *Morton Int'l, Inc.*, the court found that the lack of enablement had been proved as required, because using the patented process, the claimed compounds were not produced. *Morton Int'l*, 5 F.3d at 1469;

*see also North Am. Vaccine*, 7 F.3d at 1579 (fact that utilization of patent process might result in products that do not meet the objects of the invention "goes to ... lack of enablement under 35 U.S.C. § 112, first paragraph," not to definiteness); *Amgen*, 927 F.2d at 1212.

The court's discussion of the manner in which the defendant in *Morton Int'l, Inc.*, proved a lack of enablement is instructive on the differences between enablement and definiteness and on the question of whether or not the patent in suit here meets the enablement requirement:

> The specification purports to teach, with over fifty examples, the preparation of the claimed compounds with the required connectivity. However, the district court found that
>
> > [e]ven with the aid of sophisticated analytical instrumentation and the use of model systems which attempt to provide the compounds claimed in the '881 patent, however, there is no evidence that such compounds exist. The clear and convincing evidence has shown that the examples of the '881 patent do not produce the postulated compounds. Rather, the examples and procedures produce a complex mixture of alkyltin mercaptides and alkyltin sulfides. The evidence established that a number of these are prior art compounds known to be useful as heat stabilizers.

These findings are supported by the record. On review of the record, there is considerable evidence showing that those skilled in the art could not make the claimed compounds using the procedures of the specification, and no evidence that such compounds even exist. The fifty-odd examples in the patent obviously teach something, but the evidence shows that they did not teach what was allegedly defined in the claims. Because ... clear and convincing evidence [produced by the party asserting lack of enablement] was not rebutted by [the patentee], such as by showing that the examples do indeed produce the compounds containing the

claimed connectivity, we see no error in the district court's determination.

*Morton Int'l, Inc.*, 5 F.3d at 1469–70. This discussion makes clear the manner in which "utilization" goes to enablement, because the inability of those familiar with the art to utilize the invention to produce the claimed product demonstrated the lack of enablement of the patent.

In *Wright,* the court found that the patent was not enabling to the full extent of the claim or even to the extent of a more limited claim. *Wright,* 999 F.2d at 1561 ("Although not explicitly stated in section 112, to be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation,'" quoting *Vaeck,* 947 F.2d at 495). The court found that the patent was not sufficiently enabling, because it purportedly taught a process for producing a variety of vaccines, but the specification taught the process only for a single strain of a single virus, and did not account for adjustments to the process necessary for other variables present with other viruses. *Id.* at 1562. Rather, undue experimentation would be required to apply the process to other viruses. *Id.* Similarly, in *In re Goodman,* the court found that a patent claim was not sufficiently enabling, because the patent did not contain sufficient information to enable the broad scope of the claims. *In re Goodman,* 11 F.3d 1046, 1050 (Fed.Cir.1993). In *Goodman,* the court found that the sole example teaching the method in the patent would not enable a person skilled in the art to "produce any type of mammalian protein in any type of plant cell," and no supporting authority could dispel the uncertainties about how the method could be applied to produce the intended product. *Id.* at 1050–51. The court found that the prior art and the inventor's own learned paper demonstrated "the need for extensive experimentation to practice the claimed method" for just a few examples, let alone for all possible examples, as the patent application broadly claimed. *Id.* at 1052.

The concerns with the scope of enablement and the degree of experimentation necessary to apply the teachings of the patent are also apparent in *Amgen:*

> That some experimentation is necessary does not constitute lack of enablement; the amount of experimentation, however, must not be unduly extensive. The essential question here is whether the scope of the enablement of [the] claim ... is as broad as the scope of the claim....
>
> [I]t is not necessary that a patent applicant test all the embodiments of his invention; what is necessary is that he provide a disclosure sufficient to enable one skilled in the art to carry out the invention commensurate with the scope of his claims.

*Amgen,* 927 F.2d at 1212–13 (internal citations omitted); *see also Fiers,* 984 F.2d at 1171–72 ("'[A] specification disclosure which contains a teaching of the manner and process of making and using the invention in terms which correspond in scope to those used in describing and defining the subject matter sought to be patented *must* be taken as in compliance with the enabling requirement of the first paragraph of § 112 *unless* there is reason to doubt the objective truth of the statements contained therein which must be relied on for enabling support,'" quoting *In re Marzocchi,* 439 F.2d 220, 223 (C.C.P.A.1971)); *In re Vaeck,* 947 F.2d at 495 (§ 112 requires that scope of the claims bear a reasonable correlation to the scope of enablement provided by the specification). However, a patent is not intended to be a production specification. *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 941 (Fed.Cir.) ("It is not fatal if some experimentation is needed, for the patent document is not intended to be a production specification."), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990). Thus, the fact that Cedarapids technicians had to do some amount of experimentation to develop the Rollercone II or to test the Nordberg patent does not necessarily establish lack of enablement of the '745 patent; rather, the question is whether the degree of experimentation Cedarapids technicians had to do was "unduly extensive." *Amgen,* 927 F.2d at 1212–13; *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1571 (Fed.Cir.1991) ("The purpose of this provision [§ 112, ¶ 1] is to assure that the inventor provides sufficient

information about the claimed invention that a person of skill in the field of the invention can make and use it without undue experimentation, relying on the patent specification and the knowledge in the art."); *Northern Telecom,* 908 F.2d at 941.

In *Genentech, Inc.,* the court addressed more directly what constitutes undue experimentation. *Genentech, Inc.,* 29 F.3d at 1564. In that case, the court held that a patented process involving recombinant DNA technology to produce certain proteins lacked the necessary enablement, because it found that the determination of which permutations of DNA produced operative proteins required "an undue amount of experimentation." *Id.* The court found that defendants had "expended a significant amount of effort—$20 million and 130 man-years—to develop [the allegedly infringing product] notwithstanding the prior work that led to the filing of the [patents in suit]." *Id.* at 1564 n. 24.

Cedarapids asserts that the '745 patent is not sufficiently enabling for a number of reasons. Cedarapids argues that the patent provides insufficient information about how much the speed and throw of the crusher are to be increased, from what beginning point or starting settings these increases are to be made, and the limits of the possible increases before returns diminish rather than increase, and, most importantly, precisely what is the combination of these variables to obtain increased productivity. Cedarapids also asserts that the necessity for its extensive experimentation in order to make changes to speed and throw work effectively demonstrates that the '745 patent was not sufficiently enabling. At oral arguments, Nordberg asserted that the invention was not how much any variables were to be increased, but the fact that both speed and throw should be increased *simultaneously,* and that the patent teaches with sufficient clarity how to use the process for improving productivity without stating specific numbers. However, Nordberg also points out that the specification of the patent states that throw can be increased by as much as 40% and speed can be increased as much as 100% over standard settings for a 7–foot crusher. Nordberg also disputed the extent and cost of the experi-

mentation Cedarapids undertook to learn to use the teachings of the patent.

■ The court finds that there is an underlying factual dispute as to the amount of experimentation Cedarapids actually had to undertake that is material to determination of whether or not the patent in suit is sufficiently enabling. *Morton Int'l, Inc.,* 5 F.3d at 1469; *In re Wright,* 999 F.2d at 1561; *Fiers,* 984 F.2d at 1171; *Amgen, Inc.,* 927 F.2d at 1212; *In re Wands,* 858 F.2d at 735. Such a factual dispute could preclude summary judgment on the enablement issue as a matter of law were it the only ground upon which the court could make its enablement determination. *Hormone Research,* 904 F.2d at 1568. If it was necessary for Cedarapids to invest two years and $2 million into experimentation to make the '745 patent work, as Cedarapids asserts, that amount of experimentation could indeed be "undue." *See Genentech,* 29 F.3d at 1564 & n. 24. On the other hand, if it was only necessary for Cedarapids to make relatively few tests at a cost of only $12,000 to verify the teachings of the '745 patent and to develop from the patent an effective design for a high productivity crusher, such as the Rollercone II, as Nordberg asserts, that degree of experimentation would not be "undue," because a patent is not intended to be a production specification. *See Northern Telecom,* 908 F.2d at 941.

■ However, in order to preclude summary judgment, a factual dispute must be material to the disposition of the issue under the applicable law. *Anderson,* 477 U.S. at 248; *Tone Bros., Inc.,* 28 F.3d at 1196; *Keystone Retaining Wall,* 997 F.2d at 1449; *Stark,* 29 F.3d at 1572; *Continental Can,* 948 F.2d at 1265. The applicable law here requires the court to determine whether the invention was described with sufficient exactness to "enable any person skilled in the art . . . to make and use the same." *Morton Int'l, Inc.,* 5 F.3d at 1469; *Fiers,* 984 F.2d at 1171. In this case, the court finds that the enablement issue may be disposed of regardless of the degree to which Cedarapids had to engage in experimentation to bring the teachings of the '745 patent to fruition, because the '745 patent would not enable a

person skilled in the art to make and use the invention. *Id.* It is clear to the court that there are inadequate references either for beginning points or degree of adjustments to the identified variables, the interrelationship between the adjustments to the two variables, or sufficient certainty that the same degree of increased speed and throw would produce the expected results for the full scope of conical crushers to which the '745 patent purportedly applies. *Morton Int'l, Inc.,* 5 F.3d at 1469–70; *Wright,* 999 F.2d at 1561.

For example, the specification conveys uncertainty about the degree of increase to be applied to the full range of crusher sizes, because it states only that the maximum increases are examples for a 7–foot crusher, and it does not purport to indicate the same degree of change for any and all crushers. The state of the art at the time of the patent application, *Wright,* 999 F.2d at 1562, shows that persons skilled in the art understood how to change speed and throw and even that speed and throw independently were factors in crusher productivity. Nonetheless, Nordberg undertook experimentation for several years to arrive at a combination of increased speed and throw that would produce an increase in productivity in a 7–foot crusher. The fact that Nordberg's patent may provide some indication of the maximum scale or degree of increase appropriate for a 7–foot crusher does not make the patent sufficiently enabling. *Wright,* 999 F.2d at 1562. Rather, undue experimentation would be required to apply the process to other sizes of crushers. *Id.* Thus, the claim did not contain sufficient information to enable the broad scope of the claims, which purportedly reach any crusher. *Goodman,* 11 F.3d at 1050 (teaching of sole example of application of the method in the patent would not enable a person skilled in the art to "produce any type of mammalian protein in any type of plant cell"). No supporting authority dispelled the uncertainties about how the method could be applied to produce the intended increase in productivity. *Id.* at 1050–51. Thus, there remained "the need for extensive experimentation to practice the claimed method" for the sole example given as well as for all possible examples, as the patent appli-

cation broadly claimed. *Id.* at 1052. The '745 patent was not sufficiently enabling as a matter of law. Cedarapids is therefore entitled to summary judgment in its favor on the enablement issue, *see, e.g., Fed.R.Civ.P.* 56(c); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Transmatic,* 53 F.3d at 1274; *Comair Rotron,* 49 F.3d at 1536, and the '745 patent is declared invalid.

#### *b. Definiteness*

■ Cedarapids has also argued that the '745 patent fails for lack of the requisite definiteness; therefore, the court will develop in more detail the relevant definiteness inquiry to determine whether this requirement has been met here. Like "enablement," "definiteness" is a question of law which will be reviewed *de novo* by the appellate court. *North Am. Vaccine,* 7 F.3d at 1579; *Miles Lab.,* 997 F.2d at 874; *Stiftung,* 945 F.2d at 1181; *Hybritech II,* 849 F.2d at 1453; *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1576 (Fed.Cir. 1986).

In *Morton Int'l, Inc.,* assertions of a lack of definiteness required the court to determine "whether those skilled in the art would understand what is claimed when the claim is read in the light of the specification." *Morton Int'l,* 5 F.3d at 1470; *see also North Am. Vaccine,* 7 F.3d at 1579 (same test); *Miles Lab.,* 997 F.2d at 874 ("The 'distinctly claiming' requirement means that the claims must have a clear and definite meaning when construed in the light of the complete patent document," and stating the test for definiteness as understanding what is claimed); *Orthokinetics,* 806 F.2d at 1576 ("A decision on whether a claim is invalid under § 112, 2d ¶, requires a determination of whether those skilled in the art would understand what is claimed when the claim is read in light of the specification."); *Amgen,* 927 F.2d at 1217. In *Morton Int'l,* the court found that clear and convincing evidence established that one skilled in the art could not determine whether a given compound was within the scope of the claims, because the claims were not sufficiently precise to permit a potential competitor to determine whether or not the competi-

tor was infringing. *Morton Int'l*, 5 F.3d at 1470.

 The degree of precision with which adequate claims must be stated to meet the definiteness requirement "is a function of the nature of the subject matter." *Miles Lab.*, 997 F.2d at 875. Thus, in *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819 (Fed.Cir.), *cert. denied*, 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988), the court considered whether expressions like "substantially equal" or "to closely approximate" rendered the patent too indefinite for a person skilled in the art to recognize what was the claimed invention:

> The criticized words are ubiquitous in patent claims. Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts. As this court put it in *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546–47, 221 USPQ 1, 7 (Fed.Cir.1984):
>
>> Beckman attacks the claims as indefinite, primarily because "close proximity" is not specifically or precisely defined. As stated in the district court's Memorandum Decision, "to accept Beckman's contention would turn the construction of a patent into a mere semantic quibble that serves no useful purpose."
>
> In *Rosemount* the district court found that " 'close proximity' is as precise as the subject matter permits." *Id.* In *Seattle Box Co. v. Industrial Crating & Packing*, 731 F.2d 818, 826, 221 USPQ 568, 573–74 (Fed. Cir.1984) (citing *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557, 220 USPQ 303, 316 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)), the court remarked that "substantially equal" is a term of degree, and that its acceptability depends on "whether one of ordinary skill in the art would understand what is claimed ... in light of the specification," even if experimentation may be needed.

*Andrew Corp.*, 847 F.2d at 821. Turning to the definiteness of the patent in contention

before it, the court in *Andrew Corp.* found that "[n]either the record nor the law supports Gabriel's position that one of ordinary skill in the art would not know when the RPEs were 'substantially equal' or 'closely approximate,' " and the district court's ruling to the contrary, finding invalidity for lack of definiteness, had to be reversed. *Id.* at 822; *and compare Amgen*, 927 F.2d at 1218 (finding that "about," in claim asserting "about" the number of specific activity units of genetic material the purported invention would produce, rendered it indefinite, but cautioning that terms of approximation may be acceptable in appropriate fact situations, citing *W.L. Gore & Assocs.*, 721 F.2d at 1557). Similarly, in *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed.Cir. 1986), the court found that the "full, clear, concise, and exact" requirement appears only in the first paragraph of § 112, but is not applicable to the definiteness requirement of the second paragraph of that section. *Orthokinetics*, 806 F.2d at 1575. Thus, as long as one of ordinary skill in the art realized that certain measurements could be easily obtained, § 112, ¶ 2, required nothing more. *Id.* at 1576 (observing further that "patent law does not require that all possible lengths corresponding to the spaces in hundreds of different automobiles be listed in the patent [for a child's car seat], let alone that they be listed in the claims."). However, when the meaning of claims is in doubt, especially when there is close prior art, the claims are properly declared invalid under the definiteness requirement of § 112, ¶ 2. *Amgen*, 927 F.2d at 1218.

 Furthermore, the definiteness requirement relates only to that aspect of an invention that is sought to be patented. *Stiftung*, 945 F.2d at 1181 (" 'it is entirely appropriate and consistent with § 112 to present claims to only [one] aspect,' " quoting *Bendix Corp. v. United States*, 600 F.2d 1364, 1369, 220 Ct.Cl. 507, 514 (1979)). In examining definiteness, the court does not look to the descriptive part of the specification, but to the *claims*, "which particularly point out what the inventor regards as [its] invention ..., and each claim must be considered separately." *Stiftung*, 945 F.2d at 1181. This is

because "[i]n one piece of apparatus disclosed as an embodiment of an invention, there may be several inventions; therefore, the claims are the place to look." *Id.; see also Orthokinetics,* 806 F.2d at 1576 (district court spoke inappropriately of indefiniteness of the "patent," when it is the *claim* that must be reviewed for indefiniteness under the second paragraph of § 112). In determining whether a claim is sufficiently definite to meet the requirements of § 112, ¶ 2, the court may not "redraft the claims and then hold invalid the redrafted claims," but must instead look at the claims themselves. *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 680 (Fed. Cir.1985). The court may look to dependent claims to aid in interpreting the scope of the claims from which they depend, but dependent claims are "only an aid to interpretation and are not conclusive." *North Am. Vaccine,* 7 F.3d at 1577 ("The dependent tail cannot wag the independent claim dog.").

Here, Cedarapids's attack on the definiteness of Claim 1 of the '745 patent is that it is unclear from the claim which of three scenarios is claimed to be implicated: retrofit of an existing crusher, replacement of an existing crusher with a higher performance crusher, or design of a higher performance crusher in comparison to a preexisting design. The fact that all three scenarios are possible, says Cedarapids, means that Claim 1 of the patent is indefinite for failure to distinctly claim the invention. Cedarapids argues that the indefiniteness of Claim 1 is brought home by uncertainty of whether the patent is infringed by replacing an existing crusher with one of a different brand that has the characteristics of increased speed and throw. Cedarapids also argues that it is unclear from the claim whether the '745 patent purports to apply only to 7-foot crushers or to any crusher.

Nordberg counters that all three scenarios suggested by Cedarapids are essentially the same, requiring application of the method taught in Claim 1 of the '745 patent to obtain improved performance, whether the method is practiced on paper in a design, or on an existing crusher in the field. Nordberg points to deposition testimony of experts on both sides describing the HP300 as a "retro-fit" design of the Omnicone or the Rollercone II as a "retrofit" of the Rollercone Classic. Nordberg also points to the frequency of the use of the term "specified" in Claim 1 as establishing the point of comparison for practicing the method, and hence the scope of the claimed invention. Thus, if one replaces an existing crusher with one of a different brand, one has not practiced the patented method on a crusher with "specified" values. Further, Nordberg asserts that the invention claimed in Claim 1 is *increasing speed and throw simultaneously,* rather than increasing them to any specified value. Thus, Nordberg asserts, it was not required to specify a degree of increase or resulting values, and therefore its claim is specific to the degree required by the subject matter. However, Nordberg points to the dependent claims as providing limits to the increases intended.

■ The court concludes that Claim 1 of the '745 patent is fatally indefinite. The independent claim in question here claims as the invention a method for increasing productivity of "a conical crusher" with a number of "specified" characteristics,

> said method comprising:
>> increasing said throw of said head over the specified throw; and
>> increasing said gyrational speed over the specified speed.

'745 Patent, Claim 1. The court acknowledges that the "specified" values for "a conical crusher," indeed any crusher, are readily ascertainable and that every person skilled in the art would understand what each of the characteristics or variables of crusher performance identified is; therefore, the claim here does not fail for indefiniteness on that ground. *Andrew Corp.,* 847 F.2d at 822; *Orthokinetics,* 806 F.2d at 1576. Nor would it be unclear to any person skilled in the art how to increase the speed and throw of a crusher. Were these aspects of crusher construction or performance of any uncertainty standing alone, the specification of the patent would certainly dispel any confusion. *See, e.g., Morton Int'l, Inc.,* 5 F.3d at 1470 (question is whether those skilled in the art would understand what is claimed in light of the specification); *North Am. Vaccine,* 7 F.3d at 1579 (same test); *Miles Lab.,* 997 F.2d at 874

(same). Thus, these aspects of Claim 1 are stated with sufficient definiteness in light of the subject matter of the patent. *Miles Lab.*, 997 F.2d at 875.

However, the definiteness requirement relates only to that aspect of an invention that is sought to be patented. *Stiftung*, 945 F.2d at 1181. The claim itself is for improved productivity as the result of increasing speed and throw. Although terms of approximation may not be fatal to the definiteness of a claim, *see Andrew Corp.*, 847 F.2d at 822; *and compare Amgen*, 927 F.2d at 1218, the claim here provides *no* indication of the degree to which either variable must be increased or the relative proportion of increase between the two variables. There was undeniably close prior art, in the form of Symons crushers, which distinguished itself from other traditional cone crushers on the basis of increased speed and throw. *Andrew Corp.*, 847 F.2d at 821 (patent is invalid for indefiniteness if it does not distinguish claimed invention from close prior art); *Amgen*, 927 F.2d at 1218 (same). Nordberg has throughout this litigation asserted that Symons crushers are to be distinguished from other traditional cone crushers, like those manufactured by Allis–Chalmers. Therefore, the meaning of the claim here, which again speaks of increased speed and throw without further distinguishing the claimed invention from the distinguishing features of the traditional Symons crusher, is in doubt, and Claim 1 is properly declared invalid under the definiteness requirement of § 112, ¶ 2. *Amgen*, 927 F.2d at 1218.

Being careful not to let the "dependent tail" wag the "independent claim dog," the court will look to the dependent claims to see if they provide enough definiteness to overcome these deficiencies. *North Am. Vaccine*, 7 F.3d at 1577. Dependent claim 3 does state that the "throw" of the crusher should be "increas[ed] . . . on the order of 40% over said specified throw." However, no dependent claim identifies the degree to which speed must be increased, but only some identify increases in "power draw" in terms of percentage of increase and horsepower increase. '745 Patent, Claims 5 & 6. The court is well aware that increased horsepower and power draw do not necessarily or

directly translate into increased speed. Indeed, recourse to the dependent claims muddies rather than clarifies the scope of the claim, because they suggest that other aspects of the crusher besides speed and throw are involved in the asserted invention, including head diameter (dependent claims 2 and 7) and bowl liner volumetric capacity (dependent claims 4 and 8). Thus, the dependent claims cannot cure the indefiniteness flaw found in the independent claim at issue here. A person of ordinary skill in the art would be unable to determine what was claimed to be the invention. *Morton Int'l*, 5 F.3d at 1470.

In addition to these flaws in the definiteness of the claimed invention, Claim 1 is indefinite as to the situation to which it applies, whether a redesign on paper or a retrofit or replacement in the field. Thus, the claim is not sufficiently precise to permit a potential competitor to determine whether or not the competitor is infringing. *Morton Int'l*, 5 F.3d at 1470. Claim 1 is cast in terms of "a conical crusher." Although Nordberg asserts that "a conical crusher" and alterations to it are the same whether the crusher and the changes are on paper in a design or on tangible, functioning machinery in the field, the court concludes that the subject matter is amenable to specifying more definitely the scenario or scenarios intended for a person skilled in the art. *Miles Lab.*, 997 F.2d at 875. Read literally, the claim suggests a particular machine, with the characteristics mentioned having fixed or "specified" values, to which alterations are made. Some of the dependent claims speak in terms of "replacing" parts of that machine with other parts of different proportions. These aspects of the claim and the dependent claims suggest a "retrofit" of an existing machine more readily than alteration of the design or specifications of a newly-designed crusher as compared to prior designs. Yet, both a tangible, existing crusher, and a pre-existing design could provide a starting point from which the suggested alterations could be made. A competitor proceeding in one situation or the other would not be able to tell whether or not its conduct was infringing. *See, e.g., Morton Int'l*, 5 F.3d at 1470

(patent is indefinite if competitor cannot tell if its conduct is infringing).

Cedarapids is therefore entitled to summary declaratory judgment that the '745 patent is invalid owing to indefiniteness for two reasons. First, the court concludes that Claim 1 of the '745 patent is too indefinite to meet the requirements of 35 U.S.C. § 112, ¶ 2, as to degree and interrelationship of the increased "speed" and "throw" called for by the purported invention so as to distinguish it from close prior art. Second, the patent is indefinite under § 112, ¶ 2, because the scenarios to which the method can be applied are uncertain, such that a competitor would be unable to tell whether or not its conduct was infringing the patent. Cedarapids is therefore entitled to judgment as a matter of law that the '745 patent is invalid pursuant to § 112, ¶ 2, owing to indefiniteness, *see, e.g., Fed.R.Civ.P.* 56(c); *Celotex,* 477 U.S. at 322–23; *Transmatic,* 53 F.3d at 1274; *Comair Rotron,* 49 F.3d at 1536, and the '745 patent is declared invalid.

Although Cedarapids prevails on the issue of definiteness, as it did on enablement, the court nonetheless will consider other issues presented by the parties' cross-motions for summary judgment.

**2. Prior art**

Cedarapids also contends that Nordberg's purported invention is invalid on the basis of prior art. "The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness." *In re Napier,* 55 F.3d 610, 613 (Fed. Cir.1995). An invention is not patentable if it was anticipated pursuant to 35 U.S.C. § 102(a):

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent....

35 U.S.C. § 102(a). Nor is an invention patentable if it was obvious under the prior art pursuant to 35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains....

35 U.S.C. § 103. The parties have contested the validity of the '745 patent on both anticipation and obviousness grounds here. The court turns first to the question of anticipation of the '745 patent under the prior art, then to the question of obviousness.

**a. Anticipation**

Although obviousness is determined as a question of law, a matter addressed below, anticipation is a *factual* matter reviewed for clear error. *Glaxo, Inc. v. Novopharm, Ltd.,* 52 F.3d 1043, 1047 (Fed. Cir.1995); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1554 (Fed.Cir.1995); *Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1052 (Fed.Cir.1994); *In re Paulsen,* 30 F.3d 1475, 1478 (Fed.Cir.1994); *Westvaco Corp. v. International Paper Co.,* 991 F.2d 735, 746 (Fed.Cir.1993); *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 677 (Fed. Cir.1988). Anticipation must be proved by clear and convincing evidence. *Electro Med. Sys.,* 34 F.3d at 1052; *Westvaco,* 991 F.2d at 746 ("bald assertion" that prior art reference "clearly discloses all of the limitations of claim 33" was insufficient to show district court erred in ruling that anticipation had not been proved by clear and convincing evidence); *Shearing v. Iolab Corp.,* 975 F.2d 1541, 1544 (Fed.Cir.1992).

A claim is anticipated and therefore invalid only when a single prior art reference discloses each and every limitation of the claim. *Glaxo,* 52 F.3d at 1047 (citing *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1571 (Fed.Cir.1986), *cert. denied sub nom. Stora Kopparbergs Bergslags AB v. Crucible, Inc.,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987)); *Glaverbel,* 45 F.3d at 1554 ("Anticipation requires identity of the

claimed process and a process of the prior art; the claimed process, including each step thereof, must have been described or embodied, either expressly or inherently, in a single reference."); *Electro Med. Sys.*, 34 F.3d at 1052 (Anticipation under § 102 "requires the presence in a single prior art disclosure of each and every element of a claimed invention."); *In re Paulsen*, 30 F.3d at 1478–79; *Shearing*, 975 F.2d at 1544 (prior art reference must "disclose in advance of [the patentee's] invention each and every element of the ... patent's claims," citing *Scripps Clinic*, 927 F.2d at 1576); *Continental Can Co. U.S.A. v. Monsanto Co.*, 948 F.2d 1264, 1267 (Fed.Cir.1991) (describing the requirement of § 102(a) as a "statutory requirement that a patented invention be 'new'"); *Scripps Clinic*, 927 F.2d at 1576; *Diversitech*, 850 F.2d at 677. The disclosure of the prior art need not be express, but may inherently anticipate the patented invention where the inherent anticipation would be appreciated by one of ordinary skill in the art. *Glaxo*, 52 F.3d at 1047 (citing *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir. 1991)); *Glaverbel*, 45 F.3d at 1554; *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed.Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992); *Scripps Clinic*, 927 F.2d at 1576.

In *Continental Can*, the court clarified the manner in which a court may determine whether asserted inherent characteristics are present in an allegedly anticipatory prior art:

> To serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence. Such evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference by persons of ordinary skill. *In re Oelrich*, 666 F.2d 578, 581, 212 U.S.P.Q. 323, 326 (CCPA 1981) (quoting *Hansgirg v. Kemmer*, 102 F.2d 212, 214, 40 U.S.P.Q. 665, 667 (CCPA 1939)) provides:

> > Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances

is not sufficient. [Citations omitted.] If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.

This modest flexibility in the rule that "anticipation" requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges. It is not, however, a substitute for determination of patentability in terms of § 103.

*Continental Can*, 948 F.2d at 1268–69. In *Continental Can*, the court determined that the district court had improperly granted summary judgment on a claim of anticipation, because there was a dispute of fact on whether the process undisputedly used in the anticipatory reference inherently produced one of the limitations of the patent in suit. *Id.* at 1269.

To put the meaning of anticipation another way, "[a]nticipation ... requires identity of invention: the claimed invention, as described in appropriately construed claims, must be the same as that of the reference, in order to anticipate." *Glaverbel*, 45 F.3d at 1554 (citing *Continental Can*, 948 F.2d at 1267); *Continental Can*, 948 F.2d at 1267 ("Anticipation under § 102(a) requires that the identical invention that is claimed was previously known to others and thus is not new."); *Scripps Clinic*, 927 F.2d at 1576. "[T]he reference must describe the applicant's claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it." *In re Spada*, 911 F.2d 705, 708 (Fed.Cir.1990). "When more than one reference is required to establish unpatentability of the claimed invention anticipation under § 102 cannot be found, and validity must be determined in terms of § 103." *Continental Can*, 948 F.2d at 1267.

To determine whether a patented invention is anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. *Glaverbel,* 45 F.3d at 1554. "If needed to impart clarity or avoid ambiguity, the prosecution history and the prior art may also be consulted in order to ascertain whether the patentee's invention is novel or was previously known to the art." *Glaverbel,* 45 F.3d at 1554. Thus, it is not "incorrect methodology" for the district court to interpret a patent claim in light of the patent specifications and the prior art and to receive expert testimony when comparing the patented invention with the prior art to determine whether or not they were the same. *Glaverbel,* 45 F.3d at 1555. The court in *Glaverbel,* cited with approval the analysis of an anticipation claim found in *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452 (Fed.Cir.1984):

> In deciding the issue of anticipation, the trier of fact must identify the elements of the claim, determine their meaning in light of the specification and prosecution history and identify corresponding elements disclosed in the allegedly anticipating reference.

*Glaverbel,* 45 F.3d at 1554 (quoting *Lindemann,* 730 F.2d at 1458).

On the ultimate question of anticipation, however, " '[t]he mere fact that a certain thing *may result* from a given set of circumstances is insufficient to prove anticipation.' " *Electro Med. Sys.,* 34 F.3d at 1052 (quoting *Continental Can,* 948 F.2d at 1268–69, with emphasis here as added in *Electro Med. Sys.*). The party asserting anticipation must show that the circumstances that produce the result were necessarily present in the prior disclosure. *Id.*

In the interest of placing this issue on its proper procedural footing and properly allocating the burdens, *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, the court notes that Nordberg injected the "anticipation" issue into contention in its motion for summary judgment. Cedarapids, although it filed its motion for summary judgment first, did not assert that any one prior art reference anticipated the '745 patent. Rather, Cedarapids asserted that the '745 patent was a combination of elements present in the prior art and as such was invalid, because it did not demonstrate a new correlation between or among the elements.[8] However, as the non-moving party on the issue presented for summary judgment by Nordberg, Cedarapids must nonetheless generate a genuine issue of material fact or entitlement to judgment as a matter of law in order to preclude summary judgment on the issue in Nordberg's, the moving party's, favor. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Until oral arguments, Cedarapids had presented no argument, factual or legal, that a single reference anticipated the '745 patent.[9] However, at oral arguments, Cedarapids identified four references as anticipating the '745 patent. The court will therefore consider whether these nominees generate a genuine issue of material fact on the issue of anticipation.

In order to make this assessment of the appropriateness of summary disposition of the anticipation issues, the court must first determine, at least to the extent necessary to resolve the anticipation issue, the meaning of the claim of the patent in suit. *Glaverbel,* 45 F.3d at 1554 (quoting *Lindemann,* 730 F.2d at 1458). Claim 1 of the '745 patent contains at least two limitations critical here. First, the method is to be applied to "a conical crusher" with "specified" values for certain characteristic parts or performance variables in order to "increase productivity." Second, the method consists of increasing *both* "speed" and "throw" of the crusher to obtain the increased productivity. The court need not pass further at this point on construction of the claim.

Each of the references put forward by Cedarapids does indeed mention both speed and throw as relevant to increased productivity of the cone crusher it describes. Howev-

---

8. The court will return to Cedarapids's "correlation" argument, but in terms of "obviousness," in the following subsection.

9. Cedarapids's resistance to Nordberg's motion for summary judgment addressed only Nordberg's "nonobviousness" arguments.

er, that does not necessarily mean that this court can make the necessary factual finding that each and every limitation of the claimed invention is present in a single anticipatory reference as required for this court to find anticipation. *See, e.g., Glaxo,* 52 F.3d at 1047; *Glaverbel,* 45 F.3d at 1554. The court finds that neither the Symons patent of 1925 nor the Nordberg brochure dating from the 1920s promoting Nordberg's "Symons" crushers is anticipatory of the '745 patent. Both plainly use as their point of departure the kind of crusher described in the brochure as "the ordinary gyratory" crusher, not the "specified" values for "a conical crusher." Nor does either reference suggest a method of increasing the productivity of "a conical crusher" by increasing these values for that particular crusher. Thus, the increases in speed and throw described in these references are from a different point of comparison, indeed, from an entirely different device. Therefore, these two prior art references do not contain every limitation of Claim 1 of the '745 patent, which has as its point of departure the Symons patented device. *Glaxo,* 52 F.3d at 1047; *Glaverbel,* 45 F.3d at 1554.

The court finds that the same *may* be true of the much later, 1970s brochure by Nordberg, which also describes a "combination of high speed gyration and wide travel of the crushing head." However, by the time this brochure was written, it could have been addressing not only a comparison to the "ordinary gyratory crusher," primarily marketed at that time by Allis–Chalmers, but also a distinction between Nordberg's line of crushers and those of the other makers Nordberg acknowledges were now making conical crushers more similar to its own "Symons" crushers than to the Allis–Chalmers ones.[10] Even so, it is unclear that this reference

describes "increasing" both speed and throw over the "specified" levels for "a conical crusher" to reap the benefits of "increased productivity," which are the limitations of Claim 1 of the '745 patent. *Glaxo,* 52 F.3d at 1047; *Glaverbel,* 45 F.3d at 1554. The uncertainty generates a genuine issue of material fact as to the anticipatory nature of this reference. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Glaverbel,* 45 F.3d at 1560.

The "Sawant Paper," which was written in 1984, is an entirely different matter, however, from any of the other prior art references suggested by Cedarapids as demonstrating anticipation of the '745 patent. In this paper, Sawant states,

> The effects of varying the head throw and head speed on the productivity of the crusher are significant with setting held constant.... [From test results,] [i]t is obvious that a crusher with a larger throw and speed capabilities is more efficient and therefore cost effective.

Exhibit B, pp. 3–4. Unlike the earlier references, Sawant was testing changing the variables of speed and throw while keeping other variables, such as setting, constant *on the same machine.* Nordberg contends that the Sawant Paper only identifies speed and throw among a number of other variables, any of which can affect crusher performance, but does not establish the interrelationships between speed and throw articulated in the '745 patent. Although the sentence quoted above from the Sawant Paper may seem to suggest changing both speed and throw variables simultaneously while holding setting constant, reading the entire passage in context, including examination of the graphs not reproduced here,[11] strongly suggest that

10. Among the other makers of crushers more like its own than like the Allis–Chalmers variety Nordberg has identified Telsmith and Cedarapids.

11. The Sawant Paper provides three graphs of test results as supporting its conclusions. Figure 1 graphs the effect of "THROW VS. CAPACITY (ALL OTHER VARIABLES CONSTANT)"; Figure 2 graphs the effect of "THROW VS. HORSE-POWER HOUR/TON (ALL OTHER VARIABLES CONSTANT)"; and finally, Figure 3 graphs

"HORSEPOWER HOUR/TON VS. WASTE (ALL OTHER VARIABLES CONSTANT)." There is no graph or combination of graphs charting capacity vs. both speed and throw. The full explication of these graphs, presented in the body of this ruling only in edited form, is as follows:

> Crusher variables that are most important to the crusher productivity are setting, head throw and head gyration speed. In aggregate applications the setting is selected based on the product requirements and is held constant.

Sawant was still considering each variable, speed or throw, in isolation and not in combination. The teachings of the Sawant Paper *may* result in the application of the method described in Claim 1 of the '745 patent, for which Sawant was one of the applicants, but the method described in the '745 patent does not necessarily result from the teachings of that prior art reference, at least as far as the court can determine on the present record. *Electro Med. Sys.,* 34 F.3d at 1052 (" '[t]he mere fact that a certain thing *may result* from a given set of circumstances is insufficient to prove anticipation.' "); *Continental Can,* 948 F.2d at 1268–69 (same). Nor is it apparent that the limitations of Claim 1 of the '745 patent are inherently present in the Sawant Paper, *Continental Can,* 948 F.2d at 1268–69, or that "the reference ... describe[s] the applicant's claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it." *In re Spada,* 911 F.2d at 708. Again, a genuine issue of material fact has been generated on the extent to which the Sawant Paper presents each and every limitation of Claim 1 of the '745 patent. Claim 1 explicitly states that *both* speed *and* throw are increased, however vaguely it indicates how much and in what interrelationship. *Glaxo,* 52 F.3d at 1047 (anticipatory reference must contain every limitation of claim in patent in suit); *Glaverbel,* 45 F.3d at 1554 (anticipatory reference must contain every step in the process stated in the claim of the patent in suit). The '745 patent may therefore be sufficiently "new" to avoid a finding of anticipation in the prior art. *Continental Can,* 948 F.2d at 1267 (describing

the requirement of § 102(a) as a "statutory requirement that a patented invention be 'new' ").

Cedarapids has not yet proved anticipation by clear and convincing evidence. *Electro Med. Sys.,* 34 F.3d at 1052; *Westvaco,* 991 F.2d at 746. However, the court concludes that Cedarapids has generated genuine issues of material fact about the extent to which two of Cedarapids's prior art references contain every limitation of Claim 1 of the .'745 patent precluding summary judgment in Nordberg's favor on the issue that the '745 patent was not anticipated under 35 U.S.C. § 102(a).[12] *Fed.R.Civ.P.* 56(c); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

### b. Obviousness

Turning from anticipation to another requirement of patentability in light of prior art, obviousness, the court again notes that the teaching of prior art is a question of fact. *In re GPAC, Inc.,* 57 F.3d 1573, 1576 (Fed.Cir.1995) ("underlying factual findings leading to an obviousness conclusion" are reviewed for clear error); *In re Napier,* 55 F.3d at 613. However, the court observes that one fundamental distinction between obviousness and anticipation, both of which are based on the relationship between the claimed invention and the prior art, is that a claim of anticipation must be based on the presence of each and every limitation of the claim in a *single* reference, *see, e.g., Glaxo,* 52 F.3d at 1047, while obviousness is determined from the combined teachings of the prior art *taken as a whole. Napier,* 55 F.3d

The effects of varying the head throw and head speed on the productivity of the crusher are significant with setting held constant. The results shown in the following figures are based on [a] large number of tests conducted both in the field and at our Mineral Research and Test Center. Figure 1 shows the effects of varying the throw on the capacity while other variables are held constant. Larger the throw higher is the capacity [sic]. Figure 2 shows what happens to energy consumption/ton when the throw is increased. As the throw increases the energy consumption/ton decreases. In aggregate applications this means more efficient crushing. Figure 3 graphically shows that [graphs omitted] when energy consumption/ton decreases, the waste (amount of − ¼" produced) decreases proportionally. Also as

the speed of head gyrations is increased product become more cubical. Based on these conclusions, it is obvious that a crusher with a larger throw and speed capabilities is more efficient and therefore cost effective.
Sawant Paper, pp. 1–4, Plaintiff's Brief In Support Of Plaintiff's Resistance To Defendant's Motion For Summary Judgment, Exhibit B.

12. The court has perused these prior art references with some care, and believes it likely that the genuine issue of material fact here cannot be resolved without greater recourse to extrinsic evidence than was available at the summary judgment stage of the proceedings. *Glaverbel,* 45 F.3d at 1554.

at 613. Furthermore, while anticipation is determined as a question of *fact, see, e.g., Glaxo,* 52 F.3d at 1047, and the teaching of prior art upon which an obviousness determination is made is also a question of fact, the ultimate determination of obviousness is a question of *law. In re Napier,* 55 F.3d at 613; *In re GPAC,* 57 F.3d at 1577 ("Whether a reference or combination of references renders a claimed invention obvious under 35 U.S.C. § 103 is a question of law subject to full and independent review in this court."); *In re Deuel,* 51 F.3d 1552, 1557 (Fed.Cir. 1995) (obviousness is a question of law reviewed *de novo,* although underlying factual determinations are reviewed for clear error); *Electro Med. Sys.,* 34 F.3d at 1052 (obviousness is a question of law based on underlying factual inquiries, which are reviewed for clear error); *Heidelberger Druckmaschinen,* 21 F.3d at 1071 (obviousness is a matter of law based on underlying factual determinations); *Miles Lab.,* 997 F.2d at 877 (ultimate legal conclusion of obviousness is a question of law, but "rests on several factual inquiries" reviewed under "clearly erroneous" standard); *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 863 (Fed.Cir.1993); *In re Hayes Microcomputer Prods. Patent Litig.,* 982 F.2d 1527, 1539 (Fed.Cir.1992); *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.,* 983 F.2d 1039, 1045 (Fed.Cir.1993).

 Invalidity based on obviousness must be established by clear and convincing evidence. *Glaverbel,* 45 F.3d at 1555; *Therma–Tru Corp. v. Peachtree Doors, Inc.,* 44 F.3d 988, 992 (Fed.Cir.1995). Obviousness *vel non* is reviewed from the viewpoint of a designer of ordinary skill or capability in the field to which the design pertains. *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1124 (Fed.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993).

 The necessary factual findings based on prior art underlying a determination of obviousness include the following: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art at the time of the invention; (3) objective evidence of nonobviousness; and (4) the differences between the prior art and the claimed subject matter. [Furthermore,]

[i]n determining the scope and content of the prior art, "[w]hether a reference ... is 'analogous' is a fact question" that [the appellate court will] review for clear error. *In re GPAC,* 57 F.3d at 1576; *Glaverbel,* 45 F.3d at 1555 (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966)); *Heidelberger Druckmaschinen,* 21 F.3d at 1071 (listing the same factual determinations); *Miles Lab.,* 997 F.2d at 877; *Texas Instruments v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1178 (Fed. Cir.1993) (citing *Graham* ); *In re Carlson,* 983 F.2d 1032, 1038 (Fed.Cir.1992) (obviousness is a legal determination based on "factual underpinnings stated in *Graham* "). Application of these factors to the obviousness determination is sometimes referred to as the *"Graham* test," because the source of the factors is the United States Supreme Court's decision in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). *Miles Lab.,* 997 F.2d at 878 (describing application of these factors as the *Graham* test); *Wang Lab.,* 993 F.2d at 863 (referring to the *"Graham* factual underpinnings" of the obviousness question). The court will explore each of the *Graham* test factors in turn.

 *i. Scope and content of prior art.* The threshold issue in a claim of invalidity based on prior art is whether secondary references legitimately fall within the scope of the relevant prior art. *In re GPAC,* 57 F.3d at 1576. The scope of the relevant prior art includes that " 'reasonably pertinent to the particular problem with which the inventor was involved.' " *In re GPAC,* 57 F.3d at 1577 (quoting *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1535, 218 USPQ 871, 876 (Fed.Cir.1983)); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1275 (Fed. Cir.1995) (the evidence the court must consider to determine the obviousness, or nonobviousness, of a patent includes "all the relevant prior art"). Therefore, the prior art relevant to an obviousness determination necessarily encompasses not only the field of the inventor's endeavor, but also any analogous arts. *Id.; Heidelberger Druckmaschinen v. Hantscho Commercial,* 21 F.3d 1068, 1071 (Fed.Cir.1994); *Wang Lab.,* 993 F.2d at 864. To decide whether a reference is from

a relevant art, the court must first determine whether the reference is within the inventor's field of endeavor, and if it is not, the court must then determine whether the reference is reasonably pertinent to the particular problem confronting the inventor. *Id.; Wang Lab.,* 993 F.2d at 864; *In re Clay,* 966 F.2d 656, 658–59 (Fed.Cir.1992). "'A reference is reasonably pertinent if, even though it may be in a different field of endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering [the inventor's] problem.'" *Id.* at 1578, (quoting *In re Clay,* 966 F.2d at 659). Therefore, if a reference disclosure relates to the same problem as that addressed by the claimed invention, "'that fact supports use of that reference in an obviousness rejection. An inventor may well have been motivated to consider the reference when making his invention.'" *Id.* (again quoting *In re Clay* ). "'Whether something legally within the prior art is 'analogous' is a fact question.'" *Wang Lab.,* 993 F.2d at 864 (quoting *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1568 n. 9 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987)).

Here, the parties have identified the scope and content of the prior art by identifying prior art references, all from the crusher industry, in the form of prior patents, sales brochures, and learned papers. Because all of the prior art references offered by the parties are plainly from the inventor's field of endeavor, the court is relieved of the obligation of assessing whether any of the references are reasonably pertinent although from a different field of endeavor. *In re GPAC,* 57 F.3d at 1577; *Wang Lab.,* 993 F.2d at 864; *In re Clay,* 966 F.2d at 658–59. All of these references, including the secondary source ones, otherwise meet the "pertinence" requirement for consideration here. *In re GPAC,* 57 F.3d at 1577; *Transmatic, Inc.,* 53 F.3d at 1275. These references uniformly identified speed and throw as among the variables affecting crusher performance.

■ Whether an invention is obvious from the prior art may in part be weighed in light of prior art that "teaches away" from the path taken by the applicant. *See In re Gurley,* 27 F.3d 551, 553 (Fed.Cir.1994). In *Gurley,* the meaning of "teaching away" was explained as follows:

A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant. The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant....

A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.

*Gurley,* 27 F.3d at 553. In *Gurley,* the court agreed that as a general rule, a reference that "teaches away" from the path taken by the patentee can not serve to create a *prima facie* case of obviousness. *Id.* However, the court held that such a rule may not be applicable in all factual circumstances, but that the nature of the teaching is highly relevant to its weight as evidence of nonobviousness. *Id.*

Here, Nordberg asserts that at least one reference in the prior art, a particle breakage study produced by personnel employed by Allis–Chalmers, dated 1981, teaches away from the method described in the '745 patent. In that study, the authors discounted the impact of throw on increased crusher capacity:

(5) It is a claim of some designs of cone crushers that the eccentric throw has some mystical influence on the capacity and size distribution produced by a particular machine. The pendulum tests supported by field observations prove conclusively that reduction and size distribution of products are simply related to the energy applied to the material. For a fixed application of power, increasing eccentric throw will reduce the force available to crush. This lowers the available power rate and, hence, the reduction ratio. The

size distribution appears to be independent of the number of impacts causing this energy application.

Defendant's Exhibit 29, p. 19. Although this reference does indeed suggest that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant, this reference will not establish nonobviousness alone just because it denigrates the importance of *one* of the critical variables of crusher performance identified in Claim 1 of the '745 patent, throw, as of doubtful influence. *Gurley,* 27 F.3d at 553. Thus, the scope and content of the prior art identifies the variables of crusher performance emphasized and simultaneously increased in the '745 patent, without specifically "teaching away" from combined increases in those variables. The court will return the differences between the patent in suit and the prior art identified here when it turns to the fourth factor in the *Graham* analysis.

■ *ii. Level of ordinary skill in the art.* As to the second factual finding involving prior art, the level of ordinary skill in the art, the person of ordinary skill in the art "is a hypothetical person who is presumed to know the relevant prior art." *In re GPAC,* 57 F.3d at 1579. Various factors go into the court's determination of skill level, including " 'type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field,' " although every factor may not be present, and one or more factors may predominate. *Id.* (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed. Cir.1986)); *Miles Lab.,* 997 F.2d at 878 (level of ordinary skill in the art may suggest ease of modifications asserted in patent and thorough knowledge of the principles involved).

Here, the parties do not dispute that persons of ordinary skill in the art recognized that variables affecting crusher performance included speed and throw. Nor do they dispute that persons of ordinary skill in the art knew how to make adjustments to each of these or any of the other variables. What is of particular interest to the court here is that

when there was a problem with the production capacity of a crusher in the field, the response of the industry, according to the testimony of witnesses for all parties, the solution was to buy a bigger crusher rather than to attempt to improve the existing crushers. In fact, the parties agree that design of crushers in the industry had been fairly static since the 1920s. Thus, although there is little doubt that the level of skill in the industry was such that adjustments, even simultaneous ones, to speed and throw could be made without undue difficulty, the pace of innovation in the industry was particularly slow. *Id.* It does not appear that prior to Nordberg's test program, any systematic tests of crusher performance variables had been undertaken by anyone. Although the parties agree that even after the appearance of the '745 patent there was no general increase in experimentation in the industry beyond desultory verification of Nordberg's results, they disagree as to whether Cedarapids's response was prompt and extensive testing and innovation of its own, suggesting a swing towards innovation in the industry, or only small-scale copycat testing. The court need not, and indeed cannot, resolve that dispute. It is sufficient, the court concludes, to note the static nature of innovation in the industry from the 1920s until the filing of the '745 patent as demonstrative of the level of *ordinary* skill in the industry. *In re GPAC,* 57 F.3d at 1576 (*Graham* factor is "level of ordinary skill in the industry").

■ *iii. Objective evidence of nonobviousness.* As to the third factual finding, objective evidence of nonobviousness, such evidence includes the commercial success of the patented invention, whether the invention addresses "long felt but unsolved needs," the failure of others to produce alternatives to the patented invention, and copying of the invention by others. *In re GPAC,* 57 F.3d at 1576, 1580; *Transmatic, Inc.,* 53 F.3d at 1275 (objective evidence of nonobviousness includes secondary evidence, such as "failure of others to achieve the patented invention and the commercial success of the patented device"); *Glaverbel,* 45 F.3d at 1555; *Electro Med. Sys.,* 34 F.3d at 1053 (listing as factors that are objective evidence of nonobvious-

ness, "long-felt but unsatisfied need, failure of others, commercial success, copying, and tribute by others," citing *Graham*, 383 U.S. at 17, 86 S.Ct. at 694); *Heidelberger Druckmaschinen*, 21 F.3d at 1072; *L.A. Gear*, 988 F.2d at 1124 (undisputed commercial success of the patented design, and appellants' copying thereof, were relevant to analysis of the obviousness of the design). All of these findings are viewed from the perspective of a hypothetical person of ordinary skill in the field of the invention. *In re GPAC*, 57 F.3d at 1579; *Glaverbel*, 45 F.3d at 1555; *In re Raynes*, 7 F.3d 1037, 1039 (Fed.Cir.1993). The proponent of the nonobviousness of the invention must establish a nexus between the evidence and the merits of the claimed invention; generally, such a nexus is shown when the patentee shows both that there is commercial success and that the thing that is commercially successful is the invention disclosed in the patent. *In re GPAC*, 57 F.3d at 1580. The degree to which the nexus is established determines the weight to be given the objective evidence of nonobviousness. *Id.* Although objective evidence of nonobviousness may weigh in favor of a nonobviousness determination, the lack of such evidence does not weigh in favor of obviousness. *Miles Lab.*, 997 F.2d at 878; *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.*, 807 F.2d 955 (Fed.Cir.1986).

Nordberg asserts that Cedarapids copied its patent to produce the Rollercone II. However, even assuming that were true, and hence Nordberg would be able to prove infringement if its patent is valid, more than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of nonobviousness. *In re GPAC*, 57 F.3d at 1580. Nordberg has also demonstrated the immediate and significant commercial success of its HP300, which is purportedly based on the '745 patent. *Id.* The undisputed evidence before the court at the summary judgment stage of the proceedings is that in the first year of production, four times as many HP300s were sold as Nordberg Omnicones during the Omnicone's first year of production. Also, the undisputed evidence at the summary judgment stage of the proceedings was that, although the industry recognized a need or had a desire for higher capacity crushers, the usual response to that need was not innovation, but purchase of a larger crusher. *Id.* Therefore, the objective evidence of nonobviousness here weighs strongly in favor of the nonobviousness of the '745 patent.

**iv. Differences between the prior art and claimed invention.** As to the fourth factual inquiry, differences between the prior art and the claimed invention, the Federal Circuit Court of Appeals has held that where the differences between the prior art and the asserted claim are "minor and achievable by simple modification," and moreover, where "the prior art references collectively suggest the engineering necessary to achieve these modifications," the prior art suggests the obviousness of the asserted invention. *Miles Lab.*, 997 F.2d at 878.

Cedarapids has asserted that Nordberg has conceded the obviousness of the '745 patent by stating that "it was well known in the crusher industry that variations in crusher speed, throw, power draw, crusher setting, feed size, feed type, ambient operational temperature, among other factors, could influence crusher productivity in tons per hour...." However, the court finds that this "concession" does no more than catalogue variables of crusher performance. It does not concede the obviousness of the *combination* of variables Nordberg asserts is the invention in the '745 patent.

In *Napier*, the court provided a succinct statement of the test and standards for a determination of obviousness in relation to combining teachings that individually may suggest separate modifications found together in the patent in suit:

"Obviousness cannot be established by combining the teachings of prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination." *In re Bond*, 910 F.2d 831, 834, 15 USPQ2d 1566, 1568 (Fed.Cir.1990) (quoting *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 140, 231 USPQ 644, 647 (Fed.Cir.1986)). However, the "suggestion to modify the art to produce the claimed invention need not be expressly stated in one or all the refer-

ences used to show obviousness." *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025, 226 USPQ 881, 886 (Fed. Cir.1985). Rather, the test is whether the combined teachings of the prior art, taken as a whole, would have rendered the claimed invention obvious to one of ordinary skill in the art. *See In re Gorman*, 933 F.2d 982, 986, 18 USPQ2d 1885, 1888 (Fed.Cir.1991).

*Napier*, 55 F.3d at 613; *see also In re GPAC*, 57 F.3d at 1581 (identifying essentially the same factors in determining differences between the prior art and the claimed invention); *L.A. Gear*, 988 F.2d at 1124 ("[A] holding of obviousness requires that there be some teaching or suggestion whereby it would have been obvious to a designer of ordinary skill to make the particular selection and combination made by the patentee," citing *In re Sung Nam Cho*, 813 F.2d 378, 382 (Fed.Cir.1987)); *Texas Instruments*, 988 F.2d at 1178 (test of invalidity based on obviousness is whether "the differences between the subject matter patented and the prior art are such that the patented subject matter as a whole would have been obvious at the time of invention to a person having ordinary skill in the art."); *In re Fritch*, 972 F.2d 1260, 1266 (Fed.Cir.1992) (" 'Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination. Under section 103, teachings of references can be combined *only* if there is some suggestion or incentive to do so,' " quoting *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984)).

Although the parties dispute whether the patent here is one for design or for retrofitting, the first step in the analysis of a claim of obviousness, when the subject is design, is

"whether there is 'a reference to something in existence, the design characteristics of which are basically the same as the claimed design, in order to support a holding of obviousness.' " *L.A. Gear*, 988 F.2d at 1124 (quoting *In re Rosen*, 673 F.2d 388, 391 (C.C.P.A.1982), and examining the design of sport shoes). Carrying the point about design obviousness a step further, the court in *L.A. Gear* observed the following:

> The district court found that all of the elements of the design of the [patent in suit] were known, but that these particular elements had not previously been combined in a single shoe design. A reconstruction of known elements does not invalidate a design patent, absent some basis whereby a designer of ordinary skill would be led to create this particular design. The district court concluded that there was no teaching or suggestion in the prior art of the appearance of the claimed design as a visual whole. We discern no error in this conclusion or the premises on which it rests.

*L.A. Gear*, 988 F.2d at 1124. The court in *Heidelberger Druckmaschinen* described this requirement as follows: "When the patented invention is made by combining known components to achieve a new system, the prior art must provide a suggestion or motivation to make such a combination.... [Where] there is nothing in the prior art to lead a person of ordinary skill to the combination of structures shown in these references," obviousness has not been shown. *Heidelberger Druckmaschinen*, 21 F.3d at 1072; *see also In re Raynes*, 7 F.3d 1037, 1039 (Fed.Cir. 1993) (same test for combination of known elements making new invention obvious, adding that "the analytic focus is upon the state of knowledge at the time the invention was made.").[13]

---

**13.** Rather than asserting obviousness as a ground for summary judgment on invalidity, Cedarapids asserted instead that the '745 patent failed to demonstrate the necessary new "correlation" between known variables of crusher performance, citing the following from *Lincoln Engineering Co. v. Stewart–Warner Corp.*, 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008 (1938):

> The mere aggregation of known or old parts or elements which in the aggregation per-

formed or produced no new and different function or operation than that heretofore performed or produced by them is *not* a patentable invention.

(Emphasis added). The proposition for which this case is cited here has not been considered by the Federal Circuit Court of Appeals (or its predecessor court) since 1959. *See Application of Wright*, 268 F.2d 757 (C.C.P.A.1959). The most recent case upon which Cedarapids relies to assert a requirement that there must be a coopera-

On this part of the *Graham* test, the court must conclude that there is a genuine issue of material fact. Some of the prior art references identify a cone crusher of the type from which the '745 patent departs. Thus, the first step of the combination analysis has been met here, because there are " 'reference[s] to something in existence, the design

tive relationship of the elements of a patent claim, or as affirming the rule that "combination claims" involving combination of "old" elements must be scrutinized with especial care, *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1566 (Fed.Cir.1983), in fact stands for the contrary position:

> Medtronic vigorously argues error in the Memorandum statement that "[c]ourts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements...." We cannot construe that statement, taken from the opinion in *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976) and *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) as a rule of law applicable broadly to patent cases because virtually every claimed invention is a combination of old elements, and ... virtually every patent can be described as a "combination patent". *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 218 USPQ 871, 880 (Fed.Cir.1983). Further the Court has recognized the patentability of combinations of old elements. *United States v. Adams*, 383 U.S. 39, 51–52, 86 S.Ct. 708, 714–715, 15 L.Ed.2d 572, 148 USPQ 479, 483 (1966) ("Despite the fact that each of the elements of the Adams battery was well known in the prior art, to combine them as did Adams required that a person reasonably skilled in the prior art must ignore" long-accepted factors.)

> There is neither a statutory distinction between "combination patents" and some other, never defined type of patent, nor a reason to treat the conditions for patentability differently with respect to "combination patents". It but obfuscates the law to posit a non-statutory, judge-created classification labeled "combination patents". *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 219 USPQ 8, 12 (Fed.Cir.1983).

*Medtronic*, 721 F.2d at 1566 (holding that the district court's error was, however, harmless in light of other considerations). Cedarapids's citation of *Medtronic* indicates the danger of doing "letterslot" research without a careful reading of the context in which the lifted language is presented.

Furthermore, the proposition Cedarapids advocates as the rule of law is nothing of the kind. In *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1556 (Fed.Cir.1986), the court observed that the district court had previously twice rejected the contention, and the court of appeals had done so once before in that case, that the patent was simply a combination of old elements. The court found that the district court had correctly held that "[i]t is the totality of all the elements and their interaction with each oth-

er which is the inventor's contribution to the art of wheelbarrow making." *Id.* The court rejected the suggestion that because the patent was only a combination of old elements, and the aggregation therefore constituted only a "minuscule" and "meager" contribution to the art. *Id.* at 1557.

Similarly, in *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542 (Fed.Cir.1983), the court held that the district court erred by identifying the patent in suit as a "combination" patent for which the critical question was whether the "aggregation produced a new or different result or achieved a synergistic effect." *Connell*, 722 F.2d at 1548. The court wrote:

> There is no support for those statements in the statute. There is no classification entitled "combination patents." Virtually every invention is a combination of elements or process steps, and synergism, or its equivalent, "new and different result," is not *required* for patentability. *Chore–Time Equipment, Inc. v. Cumberland*, 713 F.2d 774, 218 USPQ 673 (Fed.Cir. 1983); *Bowser, Inc. v. U.S.*, 388 F.2d 346, 156 USPQ 406 (Ct.Cl.1967). See Miller, "Factors of Synergism and Level of Ordinary Skill in the Pertinent Art in Section 103 Determinations," 8 APLA Jrl 321 (1980).

*Connell*, 722 F.2d at 1548–49. The court noted that nearly every invention requires building upon prior art or old elements, and that an invention in which all of the elements are old can nonetheless be an invention precisely because experts are skeptical, citing *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, 148 USPQ 479 (1966). *Id.* The court concluded that the proper question was whether the invention as a whole, in light of all the teachings of prior art, would have been obvious to one of ordinary skill in the art at the time the invention was made, citing 35 U.S.C. § 103. *Id.; see also Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984) (holding that the patent in suit was not obvious, because "a combination may be patentable whether it be composed of elements all new, partly new, or all old," citing *Connell*, and prior art did not suggest the solution to a recognized problem hit upon in the patent). This court will follow suit, and consider statutory obviousness under 35 U.S.C. § 103 (as well as anticipation under 35 U.S.C. § 102(a)) as the applicable standard for patentability in light of prior art, not some requirement of "synergism" or "correlation, coordination, and cooperation." The extent to which the patent in suit here establishes necessary standards for the interrelationship of the identified increases in speed and throw may ultimately be determined under the enablement requirement of 35 U.S.C. § 112, ¶ 2.

characteristics of which are basically the same as the claimed design.'" *L.A. Gear,* 988 F.2d at 1124. Further, both of the elements asserted by the '745 patent to be new, increased throw and increased speed, were known to those skilled in the art. *Heidelberger Druckmaschinen,* 21 F.3d at 1072; *In re Raynes,* 7 F.3d at 1039; *L.A. Gear,* 988 F.2d at 1124. However, although all of the prior art references identified speed and throw as relevant to crusher performance, there is a dispute as to whether any of them specifically identified increasing speed and throw in combination to increase the productivity of any given crusher. As the court observed in its analysis of the anticipation issue, above beginning at page 47, some of the references certainly consider the variables independently without describing the relationship between them, and some certainly compare the increased speed and throw of one kind of crusher to that of another kind. What the court found remained uncertain on the present record, in the context of anticipation, is whether any of these references discusses "increasing" both speed and throw on "a conical crusher" to increase productivity.

The slightly different question for the court in the context of obviousness is whether these references in *combination* suggest or provide an incentive for the combination of increasing speed and increasing throw. *In re GPAC,* 57 F.3d at 1582; *Napier,* 55 F.3d at 613; *L.A. Gear,* 988 F.2d at 1124; *Texas Instruments,* 988 F.2d at 1178; *In re Fritch,* 972 F.2d at 1266. Faced with the fact that the full range of variables had long been identified as relevant to crusher performance, but that the industry undisputedly remained static for many decades without exploring the effect of any variable either alone or in combination with others, the court doubts that the combination of prior art references provided the necessary suggestion or incentive. *Accord Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1546 (Fed.Cir.1984) ("real world experience" established that despite knowledge of variables in the art, solution found by plaintiff was only one in the art, suggesting nonobviousness). However, the court finds that there is a genuine issue of material fact on the combined teaching of the prior art, again because of the uncertainty of precisely what machines or designs were being compared when those references discussed increased throw and increased speed as differences. The court finds nothing in the ordinary meaning of these references that would automatically suggest to it that both speed and throw should be increased together, but the court is not a person with ordinary skill in the crusher art. *Napier,* 55 F.3d at 613 (question is whether prior art suggests the combination to a person with ordinary skill in the art); *Heidelberger Druckmaschinen,* 21 F.3d at 1072 (same); *In re Raynes,* 7 F.3d at 1039 (same); *L.A. Gear,* 988 F.2d at 1124 (same). The court finds further that there is a substantial dispute in the expert testimony as to whether or not the prior art references, now viewed after the fact but at the time they were made, would have suggested combining increases in these two variables. The court is unwilling to decide this factual issue without a full opportunity to consider the credibility of the various experts and a clearer understanding of what was known in the art at the time of the application for the '745 patent. These genuine issues of material fact preclude the court from finding either obviousness or nonobviousness as a matter of law. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

### B. Infringement

▉ Notwithstanding the court's conclusion above that the '745 patent is invalid owing to indefiniteness, the court next considers whether Cedarapids is infringing the '745 patent. This issue also has two principal prongs: (1) whether Cedarapids is literally infringing the '745 patent; and (2) whether Cedarapids is infringing the '745 patent under the "doctrine of equivalents." Each kind of infringement involves unique issues, but the ultimate issue of infringement, both literal and under the doctrine of equivalents, is an issue of fact. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995); *Morton Int'l, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1468 (Fed.Cir.1993) (hereinafter *"Morton Int'l"*).

▉ Determination of infringement, either literal or under the doctrine of equiva-

lents, proceeds in two steps: the first step is a proper construction of the claim to determine its scope and meaning, and the second step is a comparison of the properly construed claim to the accused device to determine whether the patentee has proved that the accused device embodies every limitation in the claim, either literally or by a substantial equivalent. *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993); *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1573 (Fed.Cir.1994); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir.1992); *Morton Int'l, Inc. v. Cardinal Chemical Co.*, 959 F.2d 948, 950 (Fed.Cir. 1992) (hereinafter *"Cardinal"*); *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed.Cir.), *cert. denied*, 502 U.S. 902, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991). The patentee has the burden of proving infringement by a preponderance of the evidence. *Morton Int'l*, 5 F.3d at 1468; *Hayes*, 982 F.2d at 1541; *Cardinal*, 959 F.2d at 950. The court will pursue both steps of the analysis with regard to both kinds of infringement alleged here.

■ Before turning to the infringement analysis, however, the court notes that when a patent contains only method or process claims, as the one in suit here does, those claims "are directly infringed only when the method is practiced." *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 773–75 (Fed.Cir. 1993); *Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834, 836 (Fed.Cir. 1992); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1374 (Fed. Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). The patentee may not attempt to convert its method claims into apparatus claims. *Joy Technologies*, 6 F.3d at 775–76.

### 1. Literal infringement

■ When literal infringement is alleged, the court must interpret the claims as a matter of law to determine their meaning and scope and the trier of fact must determine whether the claims as thus construed "read on" the accused product. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995); *Transmatic*, 53 F.3d at 1277 (defining the second step as "the claim as properly construed must be compared to the accused device or process"); *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed.Cir.1995) (stating the prongs of the analysis essentially as in *Southwall Technologies*); *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir.1994) (hereinafter *"Nike"*); *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1196 (Fed.Cir.1994) (hereinafter *"Wolverine"*); *Lantech, Inc. v. Keip Machine Co.*, 32 F.3d 542, 546 (Fed.Cir.1994); *Genentech, Inc. v. Wellcome Found., Ltd.*, 29 F.3d 1555, 1561 n. 6 (Fed.Cir.1994); *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 18 F.3d 927, 931 (Fed.Cir.1994); *Carroll Touch*, 15 F.3d at 1576; *Rawlplug Co., Inc. v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1041 (Fed.Cir. 1993) (prongs are "interpreting the claims of the patent and then a comparison of the properly interpreted claims with the accused device"); *North Am. Vaccine v. American Cyanamid Co.*, 7 F.3d 1571, 1574 (Fed.Cir. 1993); *Morton Int'l, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1468 (Fed.Cir.1993) ("A finding of literal infringement requires that the asserted claims, as properly construed, read on the accused product."); *In re Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d 1527, 1541 (Fed.Cir.1992); *Cardinal*, 959 F.2d at 950. Under either a literal infringement or doctrine of equivalents theory of infringement, all limitations in the patent claim must be considered. *Southwall Technologies*, 54 F.3d at 1575; *Transmatic*, 53 F.3d at 1277; *Baxter Healthcare*, 49 F.3d at 1582; *Wolverine World Wide*, 38 F.3d at 1196; *Lantech*, 32 F.3d at 547. However, for literal infringement, each limitation of the claim must be met by the accused device *exactly*, and any deviation from the claim precludes a finding of literal infringement. *Lantech*, 32 F.3d at 547; *North Am. Vaccine*, 7 F.3d at 1574.

### a. Claim construction

■ The first step, claim construction, is a matter of law for the court, and will be reviewed *de novo*. *Transmatic*, 53 F.3d at 1277; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995), *petition for cert. filed*, (U.S. July 3, 1995) (No. 95–26);

*Baxter Healthcare,* 49 F.3d at 1582; *Nike,* 43 F.3d at 646; *Wolverine World Wide,* 38 F.3d at 1196; *Genentech,* 29 F.3d at 1561; *Carroll Touch,* 15 F.3d at 1577; *North Am. Vaccine,* 7 F.3d at 1574; *Morton Int'l,* 5 F.3d at 1468; *Mendenhall,* 5 F.3d at 1578; *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991). Thus, a "mere dispute over the meaning of a term does not itself create an issue of fact." *Wolverine World Wide,* 38 F.3d at 1196; *Lantech,* 32 F.3d at 546. In *North Am. Vaccine,* the court discussed the interplay of factual and legal determinations in the interpretation of claims:

> [A] genuine evidentiary conflict underlying the meaning of claim terms raises a question of fact, but the questions before us in this case go to the heart of what the claims mean. Resolution of disputed issues regarding the meaning of contested language is ultimately a determination of what claims mean and what they cover. It is a matter of law for this court to decide without special deference to the district court. Absent "a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation[,] ... claim interpretation may be resolved as an issue of law by the court taking into account the specification, prosecution history or other evidence...." *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1579–80, 12 USPQ2d 1382, 1386 (Fed.Cir.1989) (citations omitted).

*North Am. Vaccine,* 7 F.3d at 1575; *and compare Miles Lab.,* 997 F.2d at 876 ("Claim interpretation proceeds as a question of law[,] [but] [w]hen a trial court ... resolves factual disputes underlying the meaning of claim terms, this court reviews these findings under the clearly erroneous standard," internal citations omitted). However, in *Markman,* the court "settle[d] inconsistencies in our precedent" and held as follows:

> in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim. As such, "[a] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims." 3 *Robinson on Patents,* [2 William C. Robinson, *The Law of Patents for Useful Inventions* ]

§ 1019, at 247 [ (1890) ]. Because claim construction is a matter of law, the construction given the court is reviewed *de novo* on appeal.

*Markman,* 52 F.3d at 979. Thus, the court must interpret the claim whatever disputes as to meaning may be presented.

▇▇▇ The construction of claims begins with the language of the claims themselves. *North Am. Vaccine,* 7 F.3d at 1575; *Smith-Kline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 882 (Fed.Cir.1988). In this first step of the analysis, the claim is examined in the context of the specification, the prosecution history, and the prior art. *Southwall Technologies,* 54 F.3d at 1576; *Lantech,* 32 F.3d at 546; *Carroll Touch,* 15 F.3d at 1577; *Rawlplug,* 11 F.3d at 1041; *North Am. Vaccine,* 7 F.3d at 1576 ("When the meaning of a claim term is in doubt, we look to the specification for guidance."); *Miles Lab.,* 997 F.2d at 876; *Unique Concepts,* 939 F.2d at 1561. For example, "arguments and amendments made during the prosecution of the patent application and other aspects of the prosecution history, as well as the specification and other claims, must be examined to determine the meaning of terms in the claims." *Southwall Technologies,* 54 F.3d at 1576; *Markman,* 52 F.3d at 979. Thus, the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *Southwall Technologies,* 54 F.3d at 1576 (claims may not be construed one way in order to obtain a patent and in a different way against an accused infringer); *Markman,* 52 F.3d at 979–80 ("For claim construction purposes, the description [in the specification] may act as a sort of dictionary, which explains the invention and may define terms used in the claims."); *Zenith Lab. v. Bristol–Myers Squibb,* 19 F.3d 1418, 1424 (Fed.Cir.) ("The essence of prosecution history estoppel is that a patentee should not be able to obtain, through litigation, coverage of subject matter relinquished during prosecution."), *cert. denied,* —— U.S. ——, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994); *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 951 (Fed. Cir.1993) (same); *Haynes Int'l, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1577–78 (Fed.Cir.

1993) (same). The patentee may not offer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification, and the prosecution history. *Southwall Technologies,* 54 F.3d at 1578 (describing such a ploy by the patentee as treating the claims as a "nose of wax"); *Zenith Lab.,* 19 F.3d at 1421 ("Prosecution history serves as a limit on the scope of claims by excluding any interpretation of the claim language that would permit the patentee to assert a meaning for the claim that was disclaimed or disavowed during prosecution in order to obtain claim allowance."). "[T]he limits imposed by prosecution history estoppel can be, and frequently are, broader than those imposed by the prior art." *Haynes Int'l,* 8 F.3d at 1579.

■■ The meaning of terms as they are commonly understood in the industry, rather than conclusory legal opinions as to the meaning of a term, are also significant evidence of meaning. *Southwall Technologies,* 54 F.3d at 1578. Terms are generally given their ordinary and accustomed meanings. *Nike,* 43 F.3d at 646; *Carroll Touch,* 15 F.3d at 1577. Terms in a claim are not given their ordinary meaning to one of skill in the art, however, when it appears from the patent and file history that the terms were used differently by the applicant. *Southwall Technologies,* 54 F.3d at 1578; *Transmatic,* 53 F.3d at 1277 ("In construing a claim, claim terms are given their ordinary meaning unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise."); *Markman,* 52 F.3d at 980 (patent applicant "is free to be [its] own lexicographer"); *Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556, 1560 (Fed.Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995); *Nike,* 43 F.3d at 646; *Wolverine World Wide,* 38 F.3d at 1196; *Genentech,* 29 F.3d at 1562 (where claim was silent on the meaning of one of its terms, the court looked to the prosecution history); *Hoganas AB,* 9 F.3d at 951; *Carroll Touch,* 15 F.3d at 1577; *Mendenhall,* 5 F.3d at 1578. The patentee must, however, indicate its use of terms in a manner inconsistent with ordinary meaning "in some manner" in the patent disclosure. *Wol-*

*verine World Wide,* 38 F.3d at 1197; *see also Markman,* 52 F.3d at 980 (definition given word by patentee must be clearly defined in the specification).

■ Extrinsic evidence may also be used to assist in the determination of the meaning of terms or to demonstrate the state of the prior art at the time of the invention. *Markman,* 52 F.3d at 980. Extrinsic evidence is anything external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. *Id.* Expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used. *Id.* Thus, extrinsic evidence may be useful "to show what was then old, to distinguish what was new, and to aid the court in the construction of the patent." *Id.* at 980. However, the court may not import into its interpretation of terms unnecessary structural and functional limitations from the preferred embodiment disclosed in the patent. *Transmatic,* 53 F.3d at 1277–78; *Markman,* 52 F.3d at 981 (extrinsic evidence may be used to aid the court's understanding of the patent, but not for the purpose of varying or contradicting the terms of the claim). Nor may a court read a limitation into a claim " 'wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.' " *Zenith Lab.,* 19 F.3d at 1422 (quoting *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed. Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988)); *Hoganas AB,* 9 F.3d at 950 (also quoting *E.I. du Pont,* and stating that it is "improper for the court to add 'extraneous' limitations to a claim," which are limitations added apart from a need to interpret the meaning of the claim, and finding that the district court had impermissibly added such an extraneous limitation as to size when the limitation unambiguously referred only to shape of a fiber). Furthermore, in the court's infringement analysis, it is error for a court to compare the accused product or process with the patentee's commercial embodiment or other version of the product or process, because "the only proper comparison is with the claims of the patent." *Zenith Lab.,* 19 F.3d at 1423 (citing *Martin*

*v. Barber,* 755 F.2d 1564, 1567 (Fed.Cir. 1985)).

█ The pertinent provision of the '745 patent which the court must now interpret to resolve the motion for summary judgment on infringement is Claim 1. To assist the court in its analysis, the claim is stated with bracketed numbers indicating limitations of the claim, and subparts of a single limitation indicated by letters:

What is claimed is:

1. A [1] method for increasing the productivity of [2a] a conical crusher [2b] for comminuting a volume of material over unit time, said crusher having [3] a fixed outer configuration, [4] a fixed bowl liner having a maximum diameter, [5] a specific volumetric capacity, [6a] a conical head with [6b] a specified diameter and [6c] gyrating within said bowl liner at [7] a specified throw, said head also having [8] a specified gyrational speed and [9] power draw, and said crusher having [10] a specified setting or gap between said bowl liner and said head, with [11] the crushing action taking place when the gyrating head moves toward the bowl liner, said method comprising:

█ increasing said throw of said head over the specified throw; [13] and

█ increasing said gyrational speed over the specified speed.

The vehemently contested issue as to claim interpretation here is whether or not the claim literally applies only to a retrofit of an existing machine. Nordberg asserts that nothing in the claim distinguishes between a retrofit, meaning a tearing down and rebuilding of an existing machine, and modification of the design of a machine by practicing the method described on paper to produce a design for a new machine with improved production capacity. Cedarapids argues that the language of the claim plainly applies only to an retrofit of an existing machine: the machine must have initial speed and throw settings that are then increased by practicing the method described in the claim.

Although the parties both make arguments concerning construction of the claim that require comparison of the claim either with Nordberg's or Cedarapids's actual machines, the court must look first only to the language of the claim itself. *North Am. Vaccine,* 7 F.3d at 1575; *SmithKline Diagnostics,* 859 F.2d at 882. The claim describes practicing "a method" on "a conical crusher," [1] & [2], and that crusher must have "specified" characteristics. [3]–[11]. The method comprises increasing two variables of crusher performance *simultaneously,* [13], throw [12] and speed [14]. Applying the ordinary meanings of the language of the claim, *Nike,* 43 F.3d at 646; *Carroll Touch,* 15 F.3d at 1577, the claim plainly is not amenable to one of the scenarios Cedarapids suggests it might encompass, that of replacing an existing crusher on a work site with a different crusher, because the method is specifically practiced upon "a conical crusher." [2]. Just as plainly, the claim does not literally refer to modification of the *design* of a crusher, although at oral arguments Nordberg conceded that it would be possible for language to specify that scenario. Instead, the language refers only to practicing the method [1] of increasing two performance variables [12]–[14] on "a conical crusher." [2]. The ordinary meaning of "a conical crusher" is that the machine be in existence. *Nike,* 43 F.3d at 646; *Carroll Touch,* 15 F.3d at 1577. The court concludes that the claim literally applies only to a retrofit situation.

Nor does recourse to the specification or patent history change that conclusion. *See, e.g., Southwall Technologies,* 54 F.3d at 1578; *Transmatic,* 53 F.3d at 1277; *Markman,* 52 F.3d at 980. Nowhere does the claim or the patent suggest that the patentee has been its own lexicographer intending to encompass within the meaning of "a conical crusher" both an existing machine upon which a retrofit is to be practiced and a design upon which modifications are to be made. *Markman,* 52 F.3d at 980.[14] Just as a court cannot read a limitation into a claim from the specification

---

**14.** The court does not deem it appropriate to draw the conclusions Cedarapids asks it to draw from prior language of the claim specifically referring to "replacement" of parts, as firmly indicating a retrofit, because the court does not find any ambiguity in the language of the claim as patented.

without a need to interpret the meaning of the claim, *Zenith Lab.*, 19 F.3d at 1422; *Hoganas AB*, 9 F.3d at 950, the court does not believe it can read an *expansion* of meaning into the claim that is contrary to the ordinary meaning of the terms used. Nordberg invites the court to look to extrinsic evidence that experts on both sides referred to the HP300 as a "retrofit" of the Omnicone and the Rollercone II as a "retrofit" of the Rollercone Classic, although distinct machines and designs were involved. Although the court may look to extrinsic evidence to interpret the meaning of claim terms, it may not do so unless the terms of the claim must be interpreted in light of prior art. *Markman*, 52 F.3d at 980. The court finds no such need here. The extrinsic evidence of prior art does explain the meaning of speed and throw, but extrinsic evidence from prior art is not necessary to understand the meaning of limitations [1] and [2]. The court concludes that the claim in question must be construed to apply only to a retrofit of an existing machine.

#### b. Determination of whether the claims "read" on the accused device

■ The second step of the literal infringement analysis, whether the claim as properly construed "reads" on the accused device, is a question of fact, and is reviewed under a clearly erroneous standard. *Baxter Healthcare*, 49 F.3d at 1582; *American Cyanamid*, 7 F.3d at 1574; *Morton Int'l*, 5 F.3d at 1468. In other words, to establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Southwall Technologies*, 54 F.3d at 1575; *Transmatic*, 53 F.3d at 1277; *Baxter Healthcare*, 49 F.3d at 1582; *Wolverine World Wide*, 38 F.3d at 1196; *Lantech*, 32 F.3d at 546 ("All limitations in a claim must be considered meaningful."); *Zenith Lab.*, 19 F.3d at 1423 ("[I]n determining whether a claim in a patent has been infringed, the scientific theories utilized must establish the presence of the limitations recited in the claim."). The presence of every limitation of the patent claim in the accused product must be proved by a preponderance of the evidence. *Wolverine World Wide*, 38 F.3d at 1196.

The court in *Baxter Healthcare* clarified the differences between validity and infringement on the ground of whether the limitations in the patent "read" on the accused device:

> Implicit in [defendant's] argument is that [plaintiff], in order to establish literal infringement, must prove by a preponderance of the evidence that [defendant's] accused devices embody all the limitations in the asserted claims, and in addition, [defendant's] accused device must not be an adoption of the combined teachings of the prior art. This is not a correct statement of the law governing patent infringement. There is no requirement that the accused device be nonobvious in light of the prior art, or otherwise be itself patentable. Literal infringement exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the accused device. Questions of obviousness in light of the prior art go to validity of the claims, not to whether an accused device infringes.

*Baxter Healthcare*, 49 F.3d at 1575.

■ The question of whether each limitation of the claim "reads on" the accused device here *exactly*, *Southwall Technologies*, 54 F.3d at 1575; *Transmatic*, 53 F.3d at 1277; *Baxter Healthcare*, 49 F.3d at 1582; *Wolverine World Wide*, 38 F.3d at 1196; *Lantech*, 32 F.3d at 546; *Zenith Lab.*, 19 F.3d at 1423, need not detain the court long in light of its interpretation of the claim. Because the claim literally applies only to a retrofit of an existing machine, that claim limitation is not present in the Rollercone II, the accused device. The Rollercone II was not an existing crusher with the limitations stated in the claim that was modified by the method described. It is instead a machine with its own specified values for the described characteristics, including speed and throw, upon which no increases in speed or throw have been practiced. Each and every limitation of the claim does not read on to the accused device here. *See, e.g., Southwall Technologies*, 54 F.3d at 1575. Thus, as a matter of law, the Rollercone II does not literally infringe Claim 1 of the '745 patent. Cedarapids is therefore entitled to summary

declaratory judgment that it is not literally infringing Nordberg's patent. *Fed.R.Civ.P.* 56(c); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### 2. Infringement under the "doctrine of equivalents"

 Under a "doctrine of equivalents" theory, the first step of the literal infringement analysis, claim construction, is equally applicable. *Read Corp.*, 970 F.2d at 822 (claim interpretation as a matter of law is first step of doctrine of equivalents analysis, citing cases so holding). However, an accused product that does not literally infringe a claim may nonetheless infringe the patent under the "doctrine of equivalents" if " 'it performs substantially the same function in substantially the same way to obtain the same results.' " *Southwall Technologies*, 54 F.3d at 1579 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)); *Wolverine World Wide*, 38 F.3d at 1196 (product may infringe if it contains every limitation, either literally, or by substantial equivalence); *Genentech*, 29 F.3d at 1567 (substantial equivalence under *Graver Tank* requires a "showing of substantial identity of function, way, and result," and whether the "way" or "result" prong is met "is highly dependent on how broadly one defines the 'function' " element); *Atlanta Motoring Accessories, Inc. v. Saratoga Technologies, Inc.*, 33 F.3d 1362, 1366 (Fed.Cir.1994); *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 397 (Fed.Cir.1994); *Carroll Touch*, 15 F.3d at 1579; *Conroy*, 14 F.3d at 1574; *Goodwall Constr. Co. v. Beers Constr. Co.*, 991 F.2d 751, 758 (Fed.Cir.1993); *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991); *Conair Group, Inc. v. Automatik Apparate–Maschinenbau*, 944 F.2d 862, 866 (Fed.Cir.1991); *Dixie USA, Inc. v. Infab Corp.*, 927 F.2d 584, 587 (Fed. Cir.1991). In other words, the second step of the infringement analysis in a "doctrine of equivalents" claim becomes not whether the limitations of the patent "read on" the accused device *exactly*, but whether the limitations of the patent are at least equivalently present in the accused device. *Southwall Technologies*, 54 F.3d at 1575; *Transmatic*,

53 F.3d at 1277; *Baxter Healthcare*, 49 F.3d at 1582; *Wolverine World Wide*, 38 F.3d at 1196; *Lantech*, 32 F.3d at 547; *Dolly, Inc.*, 16 F.3d at 397.

The purpose of the doctrine of equivalents is to "prevent[ ] a copyist from evading patent claims with insubstantial changes." *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1043 (Fed.Cir.1993):

> In applying the doctrine, the Supreme Court refused to allow an "unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). This statement elucidates both the purpose of the doctrine and the type of conduct which triggers its application. An equivalent under the doctrine of equivalents results from an insubstantial change which, from the perspective of one of ordinary skill in the art, adds nothing of significance to the claimed invention. An equivalent under the doctrine of equivalents, though not literally meeting the claims, still infringes the patent.

*Valmont Indus.*, 983 F.2d at 1043; *see also Miles Lab.*, 997 F.2d at 876 ("The doctrine of equivalents prevents the pirating of the patentee's invention in the absence of literal infringement when liability is nevertheless warranted.... The doctrine of equivalents thus prevents the risk of injustice that may result from a limited focus on words alone," internal citations omitted); *Texas Instruments*, 988 F.2d at 1173 (doctrine of equivalents has been "judicially devised to do equity" in situations where there is no literal infringement, but liability is warranted). In *London*, the court found the genesis of the doctrine in a balancing of competing polices: the requirement that a patent claim be "particular" and "distinct" to provide proper notice of the claimed invention versus the policy of not depriving the patentee of the benefits of its patent by competitors "who appropriate the essence of an invention while barely avoiding the literal language of the claims." *London*, 946 F.2d at 1538 (infringement un-

der doctrine will lie where instead of inventing around the patent by making a "substantial change," the infringer essentially misappropriates or even "steals" the patented invention); *see also Slimfold Mfg. Co., Inc. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1457 (Fed.Cir.1991) ("Inherent in our claim-based patent system is also the principle that the protected invention is what the claims say it is, and thus that infringement can be avoided by avoiding the language of the claims.... It is only when the changes are so insubstantial as to result in 'a fraud on the patent' that application of the equitable doctrine of equivalents becomes desirable"; internal citations omitted).

■■■■ The doctrine of equivalents is not applicable if the devices are not equivalent in result or do not obtain those results in the same way even if they do perform the same function. *Atlanta Motoring,* 33 F.3d at 1367. Only if an accused product contains specific structure which meets all limitations of an asserted claim directed to structure, at least equivalently, can that product infringe under the doctrine of equivalents. *Southwall Technologies,* 54 F.3d at 1579; *Dolly, Inc.,* 16 F.3d at 399 (describing this as the *"Pennwalt* rule," after *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931 (Fed.Cir.1987) (in banc), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988)); *Goodwall Constr.,* 991 F.2d at 758 ("Substitution of an equivalent of the recited limitation may satisfy the 'substantially the same way' prong of the test."). A device is substantially equivalent even with additions or improvements if all the limitations in the patent claims, or the equivalents thereof, are present in the accused device. *Atlanta Motoring,* 33 F.3d at 1366.

■■■■ In a doctrine of equivalents analysis, as in a literal infringement analysis, the limitations and function of the invention *in the claims,* not the elements or functions of the accused device, establish the reference point. *Miles Lab.,* 997 F.2d at 877. The operative definition for purposes of equivalency analysis is the intended function as seen in the context of the patent, the prosecution history, and the prior art. *Genentech,* 29 F.3d at 1567. The doctrine of equivalents is "not a tool for expanding the protection of a patent after examination has been completed." *Southwall Technologies,* 54 F.3d at 1579; *Dolly, Inc.,* 16 F.3d at 398 ("The doctrine of equivalents cannot extend or enlarge the scope of the claims."). What the doctrine means is that

"[t]he claims—i.e. the scope of patent protection *as defined by* the claims—remain the same and application of the doctrine *expands the right to exclude* to 'equivalents' of what is claimed." [*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.,* 904 F.2d 677, 684, 14 USPQ2d 1942, 1948 (Fed.Cir.), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990)]. The doctrine of equivalents is not a license to ignore claim limitations.

*Dolly, Inc.,* 16 F.3d at 398. Thus, prosecution history estoppel is equally applicable to a claim of infringement under the doctrine of equivalents. *Texas Instruments,* 988 F.2d at 1173;[15] *Conair,* 944 F.2d at 866 (prosecution history applies to limit the range of equivalents patentee may assert); *Dixie USA,* 927 F.2d at 588 (patentee added limitation of rectangular and round openings to claim in application for patent on device to transport hospital patients in order to overcome rejection based on prior art, and could not later successfully argue device lacking rectangular and round limitation infringed the patent). Furthermore, the prior art restricts the scope of equivalency that the party alleging infringement under the doctrine of equivalents can assert. *Conroy,* 14 F.3d at 1576 (citing *Wilson Sporting Goods v. David Geof-*

---

**15.** In the context of alleged doctrine of equivalents infringement, the court in *Texas Instruments* wrote:

Prosecution history estoppel is a policy oriented to the range of equivalents available to the patentee, a limitation that we review as a question of law. Prosecution history estoppel will not allow the patentee to extend the range of equivalents accorded the device or process to

subject matter relinquished during prosecution of the patent.

*Texas Instruments,* 988 F.2d at 1173. The court found that the question prosecution history estoppel required be answered was whether, as a matter of law, the prosecution history indicated that the patentee had disclaimed or disavowed the specific equivalent asserted as infringing. *Id.*

*frey & Assoc.,* 904 F.2d 677, 683 (Fed.Cir. 1990)); *Conair,* 944 F.2d at 866 ("[A] district court should also ensure that the range of equivalents sought by the patentee does not "'ensnare the prior a[r]t,'"" quoting *We Care, Inc. v. Ultra-Mark, Int'l Corp.,* 930 F.2d 1567, 1570–71 (Fed.Cir.1991), which in turn quotes *Wilson* ). In *Wilson,* the case upon which *Conroy* relies for this proposition, the court held that prior art limits the scope of equivalency because "there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art." *Wilson,* 904 F.2d at 683. Thus, if the accused device relies only on prior art, there can be no infringement under the doctrine of equivalents.[16] *See International Visual Corp. v. Crown Metal Mfg.,* 991 F.2d 768, 772 (Fed.Cir.1993) (prior art limits doctrine of equivalents infringement, because patentee cannot obtain under doctrine of equivalents coverage over prior art patentee could not obtain from literal claims).

The Federal Circuit Court of Appeals recently gave a cogent synopsis of the application of the doctrine of equivalents in *Wolverine World Wide:*

> [I]n applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim. . . . "It is . . . well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." . . . To be a "substantial equivalent," the element substituted in the accused device for the element set forth in

the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

*Wolverine World Wide,* 38 F.3d at 1199 (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532–33 (Fed.Cir.1987), quoted here with citations omitted as in *Wolverine World Wide* ); *Dolly, Inc.,* 16 F.3d at 397 (also citing *Perkin–Elmer Corp.*).

 "'Under the doctrine of equivalents, the accused device and the claimed invention cannot work in "substantially the same way" if a limitation (including its equivalents) is missing.'" *Dolly, Inc.,* 16 F.3d at 398 (quoting *Valmont Indus. v. Reinke Mfg.,* 983 F.2d 1039, 1043 n. 2 (Fed.Cir.1993)); *London,* 946 F.2d at 1539 ("There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device."). However, the doctrine does not require a "one-to-one correspondence" between components of the accused device and the claimed invention. *Dolly, Inc.,* 16 F.3d at 398. An accused device may infringe under the doctrine of equivalents even though a combination of its components performs a function performed by a single element in the patented invention, but the accused device must still contain *every* limitation or its equivalent. *Dolly, Inc.,* 16 F.3d at 398. Equivalency can also exist when separate claim limitations are combined into a single component of the accused device. *Dolly, Inc.,* 16 F.3d at 398. However, a "court cannot 'convert a multilimitation claim to one

---

**16.** The court in *Wilson* presented a "hypothetical claim approach" as one optional method for determining the limitations placed on equivalency by prior art. *Conroy,* 14 F.3d at 1576. Under the *Wilson* "hypothetical claim approach," the court postulates a hypothetical patent claim sufficient in scope to cover literally the accused device, followed by the determination of whether that hypothetical claim as a whole would be patentable over the prior art. *Conroy,* 14 F.3d at 1576 (citing *Wilson,* 904 F.2d at 683–85). The *Wilson* court explained the purpose of this analytical approach as "bring[ing] the issue onto familiar turf," because the accused product has no claims to compare to the prior art, but comparison of claims to prior art is what determines the patentability of an invention. *Wilson,* 904

F.2d at 683–84. The *Wilson* court explained in more detail how its analytical approach works:

> [C]onceptualize the limitation on the scope of equivalents by visualizing a *hypothetical* patent claim, sufficient in scope to *literally* cover the accused product. The pertinent question then becomes whether that hypothetical claim could have been allowed by the [Patent and Trademark Office, or PTO] over the prior art. If not, then it would be improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine of equivalents. If the hypothetical claim could have been allowed, the *prior art* is not a bar to infringement under the doctrine of equivalents.

*Wilson,* 904 F.2d at 684.

of [fewer] limitations to support a finding of equivalency.'" *Dolly, Inc.*, 16 F.3d at 399 (quoting *Perkin–Elmer Corp.*, 822 F.2d at 1532).[17]

■■■■ Turning to another part of the equivalency analysis, an "equivalent" of a claim limitation cannot substantially alter the *manner* of performing the claimed function. *Dolly, Inc.*, 16 F.3d at 400 (citing *Pennwalt*, 833 F.2d at 935).

> Where an accused device performs substantially the same function to achieve substantially the same result, but in a substantially different manner, there is no infringement under the doctrine of equivalents. *Perkin–Elmer Corp.*, 822 F.2d at 1531 n. 6.

*Dolly, Inc.*, 16 F.3d at 400. Finally, infringement under the doctrine of equivalents does not vanish merely because the accused device performs functions in addition to those performed by the claimed device. *Miles Lab.*, 997 F.2d at 877; *Insta–Foam Prods., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698, 702 (Fed.Cir.1990).

■■■ Here, Nordberg asserts that a function/way/result analysis shows that the Rollercone II infringes its '745 method patent under the doctrine of equivalents. Nordberg asserts that as compared to the Rollercone Classic, the function of the Rollercone II, like that of the '745 patent, is to increase productivity, the way is by increasing speed and throw, and the result is that the Rollercone

II does enjoy increased productivity over the Rollercone Classic. Cedarapids asserts that there is nothing in the claim in question that makes designing a crusher with higher productivity than its predecessor substantially equivalent to the '745 patent, even if both the newly designed machine and the patent employ increased speed and throw as the way to obtain the desired result of increased productivity.

The court notes that Nordberg has improperly compressed the limitations the court must examine to just the question of whether speed and throw are both increased, without looking to the other limitations of Claim 1. *Dolly, Inc.*, 16 F.3d at 399 (doctrine of equivalents does not permit turning a multilimitation claim into one with fewer limitations). The critical limitation that the court finds Nordberg has overlooked is the limitation that the method be practiced on "a conical crusher." [2]. Thus, it would be improper for the court to examine whether the Rollercone II performs the same function, increasing productivity, in the same way, by increasing speed and throw, with the same result, increased productivity, until the court determines whether the "a conical crusher" limitation is substantially present in the Rollercone II. *Southwall Technologies*, 54 F.3d at 1579; *Wolverine World Wide*, 38 F.3d at 1199; *Dolly, Inc.*, 16 F.3d at 399 (describing this as the "*Pennwalt* rule," after *Pennwalt Corp. v. Durand–Wayland, Inc.*,

---

**17.** In *Dolly, Inc.*, the court attempted to clarify the relationship among the terms "element," "limitation," and "claim" in application of the "doctrine of equivalents" by comparing its rulings in *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed.Cir.1989), and *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931 (Fed.Cir.1987) (in banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988):

> The *Corning Glass* court rejected the accused infringer's argument that the accused fibers could not infringe under the doctrine of equivalents because they lacked a claimed "element," the core dopant. This court noted the confusion about the term "element":
>
>> "Element" may be used to mean a single limitation, but it has also been used to mean a series of limitations which, taken together, make up a component of the claimed invention. In the [*Pennwalt*] All Elements rule, "element" is used in the sense of a *limitation*

> of a claim.... An equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component, although that is generally the case.
>
> *Corning Glass*, 868 F.2d at 1259. This language, however, did not alter the *Pennwalt* rule to create a more expansive test for infringement under the doctrine of equivalents. This language from *Corning Glass* did not substitute a broader limitation-by-limitation comparison for the doctrine of equivalents than the element-by-element comparison in *Pennwalt*. Rather, the *Corning Glass* court merely clarified the meaning of the term "element" in the context of the *Pennwalt* rule. *Corning Glass* reaffirmed that the rule requires an equivalent for every limitation of the claim, even though the equivalent may not be present in the corresponding component of the accused device. *Corning Glass*, 868 F.2d at 1259.
>
> *Dolly, Inc.*, 16 F.3d at 399.

833 F.2d 931 (Fed.Cir.1987 (in banc), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988))); *Goodwall Constr.,* 991 F.2d at 758. In order for the court to find that this limitation is substantially present, the court would have to accept Nordberg's argument that increasing productivity on a crusher is the same whether the crusher is in existence and undergoing a retrofit, or only a concept on paper being redesigned in light of the patented method, with reference to a preexisting design, to produce a new design of crusher. This argument compels the court to look once again at what is the point of reference from which the method is to be practiced. In a doctrine of equivalents analysis, as in a literal infringement analysis, the limitations and function of the invention *in the claims,* not the elements or functions of the accused device, establish the reference point. *Miles Lab.,* 997 F.2d at 877. The court believes that for the same reasons the point of reference for a method patent is the claim, and only by uncomfortable extension could be made to include a preexisting device. However, the court finds that there is a genuine issue of material fact as to whether a redesign as compared to preexisting models is substantially equivalent to a retrofit of an existing crusher, the literal meaning of the claim as the court has interpreted it.

That genuine issue of material fact arises, because Nordberg has pointed to the testimony of experts from both parties identifying the HP300 as a "retrofit" of the Omnicone and the Rollercone II as a "retrofit" of the Rollercone Classic, when clearly what is meant by these experts is a design change along the parameters identified in the '745 patent. Cedarapids has pointed to the distinctly different concerns encountered in retrofitting a machine as compared to designing a new machine using as the point of departure preexisting crusher designs, including the manner in which an old design is transformed into a new machine with the anticipated improved performance.

Although the prosecution history may limit the substantial equivalents that may be considered under the doctrine of equivalents, *Texas Instruments,* 988 F.2d at 1173; *Conair,* 944 F.2d at 866; *Dixie USA,* 927 F.2d

at 588, the court finds nothing in the prosecution history specifically disavowing the reach of the claim to include design. None of the changes made in the prosecution history addressed this concern. Similarly, the prior art does not preclude a substantial equivalent of the "a conical crusher" limitation including design of a crusher. *Conroy,* 14 F.3d at 1576; *Conair,* 944 F.2d at 866. Prior art did not specifically apply increased speed and throw in either a retrofit or design scenario.

Because there is a genuine issue of material fact as to whether practicing the method in design, with a point of departure being any preexisting design, is substantially equivalent to practicing the method in a retrofit, there is also a genuine issue of material fact as to whether the Rollercone II performs the same function in the same way with the same result. For example, it is not clear that increasing speed and throw over previous models in a new design is performing substantially the same function as increasing speed and throw in the course of a retrofit of an existing machine, because the points of departure are different. *Southwall Technologies,* 54 F.3d at 1579 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)). Nor is it clear that increasing speed and throw over an old design in a new design in proceeding in the same way, because the design process for making those increases may not be the same as the practical process. *Atlanta Motoring,* 33 F.3d at 1367 (the doctrine of equivalents is not applicable if the devices are not equivalent in result or do not obtain those results in the same way even if they do perform the same function.); *Dolly, Inc.,* 16 F.3d at 398 (" 'Under the doctrine of equivalents, the accused device and the claimed invention cannot work in "substantially the same way" if a limitation (including its equivalents) is missing.' "). Finally, it is not clear that the result of increasing the speed and throw in a new design achieves a substantially similar result, because arriving at a new design with hypothetically improved productivity may not be the same as arriving at a retrofitted machine that demonstrably produces more comminuted material. *Atlanta Motoring,* 33 F.3d at 1367. Moreover, in a retrofit, the process begins and ends with

the same machine, albeit with improved capabilities, while in a redesign situation, the process begins with one model of the device, but ends with two, an "old" one that still has the same capabilities and a "new" one that has improved capabilities (it is hoped) as compared to the "old" one. These genuine issues of material fact therefore preclude summary judgment of infringement or noninfringement under the doctrine of equivalents. *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## V. CONCLUSION

The court concludes that the patent in suit is invalid. The patent fails to meet two of the requirements found in 35 U.S.C. § 112, enablement and definiteness. As to enablement, there is a genuine factual dispute as to whether or not Cedarapids had to engage in undue experimentation in order to make and use the teachings of the '745 patent. The parties dispute whether Cedarapids spent two years and two million dollars in developing a working device from the patent, or as little as $12,000 and a matter of days or weeks in "confirming" the patent's teachings. However, this dispute does not preclude summary judgment on enablement, because it is clear to the court that there are inadequate references either for beginning points or degree of adjustments to the identified variables, or sufficient certainty that the same degree of increased speed and throw would produce the expected results for the full scope of conical crushers to which the '745 patent purportedly applies, for a person of ordinary skill in the art to make and use the patented process. Nor did the patent, which gives some hint of the degree of increase in speed and throw for a single size of crusher provide sufficient enablement of the full scope of the claim, which is increased productivity of any crusher. There remains the need for extensive experimentation to practice the claimed method for all possible examples. Cedarapids is therefore entitled to summary judgment that the '745 patent is not sufficiently enabling.

As to definiteness, the other § 112 issue presented here, the court concludes that the patent is insufficiently definite to distinguish the claimed invention from undeniably close prior art, which had distinguished itself for other kinds of crushers on the ground that it employed higher speed and greater throw. In addition to this flaw in the definiteness of the claimed invention, Claim 1 is indefinite as to the situation to which it applies, whether a redesign on paper or a retrofit or replacement in the field. Thus, the claim is not sufficiently precise to permit a potential competitor to determine whether or not the competitor is infringing.

The validity of the patent in light of prior art, however, is the subject of genuine issues of material fact. Although the court has ruled out as anticipatory prior art that compared its increased throw and increased speed of the crusher head to that of another, traditional crusher design, a genuine issue of material fact was apparent as to whether two later prior art references, a 1970s brochure and the so-called "Sawant Paper," made comparisons with similar designs of crushers or with the other, traditional design. Furthermore, the "Sawant Paper" does seem to suggest increasing both speed and throw on the same machine at the same time, but its full discussion describes only the effect of changing one variable at a time. Thus, there is a genuine issue of material fact as to whether any single prior art reference anticipates every limitation of Claim 1 of the '745 patent, which explicitly states that both speed and throw are increased, however vaguely it may indicate the degree to which these variables are increased.

Nor can the court conclude that the '745 patent was obvious under the combined teachings of the prior art. Having concluded that the scope and content of the prior art and the level of ordinary skill in the art encompassed the concepts of changing speed or throw and the means to do so, the court noted that the industry nonetheless was not innovative with respect to changing these variables, either singly or in combination, for several decades. As to objective evidence of nonobviousness, it is apparent that the HP300, which purportedly incorporated the teachings of the '745 patent, enjoyed great commercial success, upsetting the static nature of development in the field. However,

there is a genuine issue of material fact as to the differences between the prior art and the purported invention, and more specifically on the question of whether the prior art provided any suggestion of or incentive for combining increases in speed and throw, largely because it is uncertain what the frame of reference was for each prior art reference. Thus, although the court concludes that the patent in suit is invalid for indefiniteness and lack of enablement, it cannot conclude as a matter of law that the patent is invalid or valid under the prior art.

Although the court has found the patent invalid, assuming the patent to be valid for the sake of addressing all issues presented by the parties, the court next examined whether either party was entitled to summary judgment on infringement. The court concludes that the patent has not been literally infringed, but that genuine issues of material fact precludes a decision as a matter of law on whether the patent has been infringed under the doctrine of equivalents. The patent literally applies only to a retrofit situation. The patent specifically refers to practicing the method on "a conical crusher," and the ordinary meaning of that phrase is that the method is to be practiced on an actual machine to improve its individual productivity. Having construed the claim in this manner, the patent is not literally infringed by a device that is built upon a new design, even if that new design differs from its predecessor in terms of increased speed and throw. With a retrofit, the result is that one machine is altered. With a redesign, the result is a predecessor model and a successor model. The first situation reads the limitation that the method be practiced on "a conical crusher" exactly onto the resulting device. The second situation plainly doesn't.

As to the doctrine of equivalents, which requires only that every limitation be substantially present, and that the allegedly infringing device perform the same function in the same way with the same result, the court perceives a genuine issue of material fact. Some of the expert testimony does suggest that in the art, retrofits and redesigns are considered substantially equivalent. However, there may be an essential difference between retrofit and redesign, because of differences in the starting point. This difficulty over the substantial similarity in starting points has a domino effect, casting doubt upon whether increasing speed and throw over previous models in a new design is performing substantially the same function as making those changes in a retrofit; whether redesigning is proceeding in the same way, because the design process for making those increases may not be the same as the practical process for retrofitting; and, finally, whether the result obtained, a new design that hypothetically provides higher productivity, and leaves the designer with both a new model and its predecessor, is substantially equivalent to arriving at a retrofitted machine that demonstrably produces more comminuted material. Thus, even if the patent were valid, the court would find that genuine issues of material fact precluded summary judgment on infringement under the doctrine of equivalents.

Having found the patent invalid, the court grants Cedarapids's motion for summary judgment, denies Nordberg's cross-motion for summary judgment, and denies the motion to bifurcate trial as moot. U.S. Patent No. 4,697,745 is declared invalid and unenforceable. Cedarapids is declared not to have infringed a valid patent. Nordberg, its officers, agents, counsel, servants, and employees, and all persons in active concert or participation with any of them, are hereby enjoined from charging infringement of or instituting any action for infringement of said patent against Cedarapids or its customers.

**IT IS SO ORDERED.**